# FEDERAL COMMUNICATIONS COMMISSION *v.* PACIFICA FOUNDATION ET AL.

No. 77–528.  Argued April 18, 19, 1978—Decided July 3, 1978

STEVENS, J., announced the Court's judgment and delivered an opinion of the Court with respect to Parts I–III and IV–C, in which BURGER, C. J., and REHNQUIST, J., joined, and in all but Parts IV–A and IV–B of which BLACKMUN and POWELL, JJ., joined, and an opinion as to Parts IV–A and IV–B, in which BURGER, C. J., and REHNQUIST, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, in which BLACKMUN, J., joined, *post,* p. 755. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 762. STEWART, J., filed a dissenting opinion, in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post,* p. 777.

*Joseph A. Marino* argued the cause for petitioner. With him on the briefs were *Robert R. Bruce* and *Daniel M. Armstrong.*

*Harry M. Plotkin* argued the cause for respondent Pacifica Foundation. With him on the brief were *David Tillotson* and *Harry F. Cole. Louis F. Claiborne* argued the cause for

the United States, a respondent under this Court's Rule 21 (4). With him on the brief were *Solicitor General McCree, Assistant Attorney General Civiletti,* and *Jerome M. Feit.**

MR. JUSTICE STEVENS delivered the opinion of the Court (Parts I, II, III, and IV–C) and an opinion in which THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST joined (Parts IV–A and IV–B).

This case requires that we decide whether the Federal Communications Commission has any power to regulate a radio broadcast that is indecent but not obscene.

A satiric humorist named George Carlin recorded a 12-minute monologue entitled "Filthy Words" before a live audience in a California theater. He began by referring to his thoughts about "the words you couldn't say on the public, ah, airwaves, um, the ones you definitely wouldn't say, ever." He proceeded to list those words and repeat them over and over again in a variety of colloquialisms. The transcript of the recording, which is appended to this opinion, indicates frequent laughter from the audience.

At about 2 o'clock in the afternoon on Tuesday, October 30, 1973, a New York radio station, owned by respondent Pacifica

---

*Briefs of *amici curiae* urging reversal were filed by *Anthony H. Atlas* for Morality in Media, Inc.; and by *George E. Reed* and *Patrick F. Geary* for the United States Catholic Conference.

Briefs of *amici curiae* urging affirmance were filed by *J. Roger Wollenberg, Timothy B. Dyk, James A. McKenna, Jr., Carl R. Ramey, Erwin G. Krasnow, Floyd Abrams, J. Laurent Scharff, Corydon B. Dunham,* and *Howard Monderer* for the American Broadcasting Companies, Inc., et al.; by *Henry R. Kaufman, Joel M. Gora, Charles Sims,* and *Bruce J. Ennis* for the American Civil Liberties Union et al.; by *Irwin Karp* for the Authors League of America, Inc.; by *James Bouras, Barbara Scott,* and *Fritz E. Attaway* for the Motion Picture Association of America, Inc.; and by *Paul P. Selvin* for the Writers Guild of America, West, Inc.

*Charles M. Firestone* filed a brief for the Committee for Open Media as *amicus curiae.*

Foundation, broadcast the "Filthy Words" monologue. A few weeks later a man, who stated that he had heard the broadcast while driving with his young son, wrote a letter complaining to the Commission. He stated that, although he could perhaps understand the "record's being sold for private use, I certainly cannot understand the broadcast of same over the air that, supposedly, you control."

The complaint was forwarded to the station for comment. In its response, Pacifica explained that the monologue had been played during a program about contemporary society's attitude toward language and that, immediately before its broadcast, listeners had been advised that it included "sensitive language which might be regarded as offensive to some." Pacifica characterized George Carlin as "a significant social satirist" who "like Twain and Sahl before him, examines the language of ordinary people. . . . Carlin is not mouthing obscenities, he is merely using words to satirize as harmless and essentially silly our attitudes towards those words." Pacifica stated that it was not aware of any other complaints about the broadcast.

On February 21, 1975, the Commission issued a declaratory order granting the complaint and holding that Pacifica "could have been the subject of administrative sanctions." 56 F. C. C. 2d 94, 99. The Commission did not impose formal sanctions, but it did state that the order would be "associated with the station's license file, and in the event that subsequent complaints are received, the Commission will then decide whether it should utilize any of the available sanctions it has been granted by Congress." [1]

---

[1] 56 F. C. C. 2d, at 99. The Commission noted:

"Congress has specifically empowered the FCC to (1) revoke a station's license (2) issue a cease and desist order, or (3) impose a monetary forfeiture for a violation of Section 1464, 47 U. S. C. [§§] 312 (a), 312 (b), 503 (b) (1) (E). The FCC can also (4) deny license renewal or (5) grant a short term renewal, 47 U. S. C. [§§] 307, 308." *Id.*, at 96 n. 3.

In its memorandum opinion the Commission stated that it intended to "clarify the standards which will be utilized in considering" the growing number of complaints about indecent speech on the airwaves. *Id.,* at 94. Advancing several reasons for treating broadcast speech differently from other forms of expression,[2] the Commission found a power to regulate indecent broadcasting in two statutes: 18 U. S. C. § 1464 (1976 ed.), which forbids the use of "any obscene, indecent, or profane language by means of radio communications,"[3] and 47 U. S. C. § 303 (g), which requires the Commission to "encourage the larger and more effective use of radio in the public interest."[4]

The Commission characterized the language used in the Carlin monologue as "patently offensive," though not necessarily obscene, and expressed the opinion that it should be regulated by principles analogous to those found in the law of nuisance where the "law generally speaks to *channeling* behavior more than actually prohibiting it. . . . [T]he con-

---

[2] "Broadcasting requires special treatment because of four important considerations: (1) children have access to radios and in many cases are unsupervised by parents; (2) radio receivers are in the home, a place where people's privacy interest is entitled to extra deference, see *Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970); (3) unconsenting adults may tune in a station without any warning that offensive language is being or will be broadcast; and (4) there is a scarcity of spectrum space, the use of which the government must therefore license in the public interest. Of special concern to the Commission as well as parents is the first point regarding the use of radio by children." *Id.,* at 97.

[3] Title 18 U. S. C. § 1464 (1976 ed.) provides:

"Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both."

[4] Section 303 (g) of the Communications Act of 1934, 48 Stat. 1082, as amended, as set forth in 47 U. S. C. § 303 (g), in relevant part, provides:

"Except as otherwise provided in this chapter, the Commission from time to time, as public convenience, interest, or necessity requires, shall—

"(g) . . . generally encourage the larger and more effective use of radio in the public interest."

cept of 'indecent' is intimately connected with the exposure of children to language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience." 56 F. C. C. 2d, at 98.[5]

Applying these considerations to the language used in the monologue as broadcast by respondent, the Commission concluded that certain words depicted sexual and excretory activities in a patently offensive manner, noted that they "were broadcast at a time when children were undoubtedly in the audience (i. e., in the early afternoon)," and that the prerecorded language, with these offensive words "repeated over and over," was "deliberately broadcast." *Id.*, at 99. In summary, the Commission stated: "We therefore hold that the language as broadcast was indecent and prohibited by 18 U. S. C. [§] 1464." [6] *Ibid.*

After the order issued, the Commission was asked to clarify its opinion by ruling that the broadcast of indecent words as part of a live newscast would not be prohibited. The Commission issued another opinion in which it pointed out that

---

[5] Thus, the Commission suggested, if an offensive broadcast had literary, artistic, political, or scientific value, and were preceded by warnings, it might not be indecent in the late evening, but would be so during the day, when children are in the audience. 56 F. C. C. 2d, at 98.

[6] Chairman Wiley concurred in the result without joining the opinion. Commissioners Reid and Quello filed separate statements expressing the opinion that the language was inappropriate for broadcast at any time. *Id.*, at 102–103. Commissioner Robinson, joined by Commissioner Hooks, filed a concurring statement expressing the opinion: "[W]e can regulate offensive speech to the extent it constitutes a public nuisance. . . . The governing idea is that 'indecency' is not an inherent attribute of words themselves; it is rather a matter of context and conduct. . . . If I were called on to do so, I would find that Carlin's monologue, if it were broadcast at an appropriate hour and accompanied by suitable warning, was distinguished by sufficient literary value to avoid being 'indecent' within the meaning of the statute." *Id.*, at 107–108, and n. 9.

it "never intended to place an absolute prohibition on the broadcast of this type of language, but rather sought to channel it to times of day when children most likely would not be exposed to it." 59 F. C. C. 2d 892 (1976). The Commission noted that its "declaratory order was issued in a specific factual context," and declined to comment on various hypothetical situations presented by the petition.[7] *Id.,* at 893. It relied on its "long standing policy of refusing to issue interpretive rulings or advisory opinions when the critical facts are not explicitly stated or there is a possibility that subsequent events will alter them." *Ibid.*

The United States Court of Appeals for the District of Columbia Circuit reversed, with each of the three judges on the panel writing separately. 181 U. S. App. D. C. 132, 556 F. 2d 9. Judge Tamm concluded that the order represented censorship and was expressly prohibited by § 326 of the Communications Act.[8] Alternatively, Judge Tamm read the Commission opinion as the functional equivalent of a rule and concluded that it was "overbroad." 181 U. S. App. D. C., at 141, 556 F. 2d, at 18. Chief Judge Bazelon's concurrence rested on the Constitution. He was persuaded that § 326's prohibition against censorship is inapplicable to broadcasts forbidden by § 1464. However, he concluded that § 1464

---

[7] The Commission did, however, comment:

" '[I]n some cases, public events likely to produce offensive speech are covered live, and there is no opportunity for journalistic editing.' Under these circumstances we believe that it would be inequitable for us to hold a licensee responsible for indecent language. . . . We trust that under such circumstances a licensee will exercise judgment, responsibility, and sensitivity to the community's needs, interests and tastes." 59 F. C. C. 2d, at 893 n. 1.

[8] "Nothing in this Act shall be understood or construed to give the Commission the power of censorship over the radio communications or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the Commission which shall interfere with the right of free speech by means of radio communication." 48 Stat. 1091, 47 U. S. C. § 326.

must be narrowly construed to cover only language that is obscene or otherwise unprotected by the First Amendment. 181 U. S. App. D. C., at 140–153, 556 F. 2d, at 24–30. Judge Leventhal, in dissent, stated that the only issue was whether the Commission could regulate the language *"as broadcast."* *Id.,* at 154, 556 F. 2d, at 31. Emphasizing the interest in protecting children, not only from exposure to indecent language, but also from exposure to the idea that such language has official approval, *id.,* at 160, and n. 18, 556 F. 2d, at 37, and n. 18, he concluded that the Commission had correctly condemned the daytime broadcast as indecent.

Having granted the Commission's petition for certiorari, 434 U. S. 1008, we must decide: (1) whether the scope of judicial review encompasses more than the Commission's determination that the monologue was indecent "as broadcast"; (2) whether the Commission's order was a form of censorship forbidden by § 326; (3) whether the broadcast was indecent within the meaning of § 1464; and (4) whether the order violates the First Amendment of the United States Constitution.

I

The general statements in the Commission's memorandum opinion do not change the character of its order. Its action was an adjudication under 5 U. S. C. § 554 (e) (1976 ed.); it did not purport to engage in formal rulemaking or in the promulgation of any regulations. The order "was issued in a specific factual context"; questions concerning possible action in other contexts were expressly reserved for the future. The specific holding was carefully confined to the monologue "as broadcast."

"This Court . . . reviews judgments, not statements in opinions." *Black* v. *Cutter Laboratories,* 351 U. S. 292, 297. That admonition has special force when the statements raise constitutional questions, for it is our settled practice to avoid the unnecessary decision of such issues. *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–569. However appro-

priate it may be for an administrative agency to write broadly in an adjudicatory proceeding, federal courts have never been empowered to issue advisory opinions. See *Herb* v. *Pitcairn,* 324 U. S. 117, 126. Accordingly, the focus of our review must be on the Commission's determination that the Carlin monologue was indecent as broadcast.

## II

The relevant statutory questions are whether the Commission's action is forbidden "censorship" within the meaning of 47 U. S. C. § 326 and whether speech that concededly is not obscene may be restricted as "indecent" under the authority of 18 U. S. C. § 1464 (1976 ed.). The questions are not unrelated, for the two statutory provisions have a common origin. Nevertheless, we analyze them separately.

Section 29 of the Radio Act of 1927 provided:

"Nothing in this Act shall be understood or construed to give the licensing authority the power of censorship over the radio communications·or signals transmitted by any radio station, and no regulation or condition shall be promulgated or fixed by the licensing authority which shall interfere with the right of free speech by means of radio communications. No person within the jurisdiction of the United States shall utter any obscene, indecent, or profane language by means of radio communication." 44 Stat. 1172.

The prohibition against censorship unequivocally denies the Commission any power to edit proposed broadcasts in advance and to excise material considered inappropriate for the airwaves. The prohibition, however, has never been construed to deny the Commission the power to review the content of completed broadcasts in the performance of its regulatory duties.[9]

---

[9] Zechariah Chafee, defending the Commission's authority to take into account program service in granting licenses, interpreted the restriction on

During the period between the original enactment of the provision in 1927 and its re-enactment in the Communications Act of 1934, the courts and the Federal Radio Commission held that the section deprived the Commission of the power to subject "broadcasting matter to scrutiny prior to its release," but they concluded that the Commission's "undoubted right" to take note of past program content when considering a licensee's renewal application "is not censorship." [10]

"censorship" narrowly: "This means, I feel sure, the sort of censorship which went on in the seventeenth century in England—the deletion of specific items and dictation as to what should go into particular programs." 2 Z. Chafee, Government and Mass Communications 641 (1947).

[10] In *KFKB Broadcasting Assn.* v. *Federal Radio Comm'n*, 60 App. D. C. 79, 47 F. 2d 670 (1931), a doctor who controlled a radio station as well as a pharmaceutical association made frequent broadcasts in which he answered the medical questions of listeners. He often prescribed mixtures prepared by his pharmaceutical association. The Commission determined that renewal of the station's license would not be in the public interest, convenience, or necessity because many of the broadcasts served the doctor's private interests. In response to the claim that this was censorship in violation of § 29 of the 1927 Act, the Court held:

"This contention is without merit. There has been no attempt on the part of the commission to subject any part of appellant's broadcasting matter to scrutiny prior to its release. In considering the question whether the public interest, convenience, or necessity will be served by a renewal of appellant's license, the commission has merely exercised its undoubted right to take note of appellant's past conduct, which is not censorship." 60 App. D. C., at 81, 47 F. 2d, at 672.

In *Trinity Methodist Church, South* v. *Federal Radio Comm'n*, 61 App. D. C. 311, 62 F. 2d 850 (1932), cert. denied, 288 U. S. 599, the station was controlled by a minister whose broadcasts contained frequent references to "pimps" and "prostitutes" as well as bitter attacks on the Roman Catholic Church. The Commission refused to renew the license, citing the nature of the broadcasts. The Court of Appeals affirmed, concluding that First Amendment concerns did not prevent the Commission from regulating broadcasts that "offend the religious susceptibilities of thousands . . . or offend youth and innocence by the free use of words suggestive of sexual immorality." 61 App. D. C., at 314, 62 F. 2d, at 853. The court recognized that the licensee had a right to broadcast this material free of prior

Not only did the Federal Radio Commission so construe the statute prior to 1934; its successor, the Federal Communications Commission, has consistently interpreted the provision in the same way ever since. See Note, Regulation of Program Content by the FCC, 77 Harv. L. Rev. 701 (1964). And, until this case, the Court of Appeals for the District of Columbia Circuit has consistently agreed with this construction.[11] Thus, for example, in his opinion in *Anti-Defamation League of B'nai B'rith* v. *FCC*, 131 U. S. App. D. C. 146, 403 F. 2d 169 (1968), cert. denied, 394 U. S. 930, Judge Wright forcefully pointed out that the Commission is not prevented from canceling the license of a broadcaster who persists in a course of improper programming. He explained:

> "This would not be prohibited 'censorship,' . . . any more than would the Commission's considering on a license renewal application whether a broadcaster allowed 'coarse, vulgar, suggestive, double-meaning' programming; programs containing such material are grounds for denial of a license renewal." 131 U. S. App. D. C., at 150–151, n. 3, 403 F. 2d, at 173–174, n. 3.

See also *Office of Communication of United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 359 F. 2d 994 (1966).

Entirely apart from the fact that the subsequent review of program content is not the sort of censorship at which the statute was directed, its history makes it perfectly clear that it was not intended to limit the Commission's power to regulate the broadcast of obscene, indecent, or profane language. A single section of the 1927 Act is the source of both

---

restraint, but "this does not mean that the government, through agencies established by Congress, may not refuse a renewal of license to one who has abused it." *Id.*, at 312, 62 F. 2d, at 851.

[11] See, *e. g., Bay State Beacon, Inc.* v. *FCC*, 84 U. S. App. D. C. 216, 171 F. 2d 826 (1948); *Idaho Microwave, Inc.* v. *FCC*, 122 U. S. App. D. C. 253, 352 F. 2d 729 (1965); *National Assn. of Theatre Owners* v. *FCC*, 136 U. S. App. D. C. 352, 420 F. 2d 194 (1969), cert. denied, 397 U. S. 922.

the anticensorship provision and the Commission's authority to impose sanctions for the broadcast of indecent or obscene language. Quite plainly, Congress intended to give meaning to both provisions. Respect for that intent requires that the censorship language be read as inapplicable to the prohibition on broadcasting obscene, indecent, or profane language.

There is nothing in the legislative history to contradict this conclusion. The provision was discussed only in generalities when it was first enacted.[12] In 1934, the anticensorship provision and the prohibition against indecent broadcasts were re-enacted in the same section, just as in the 1927 Act. In 1948, when the Criminal Code was revised to include provisions that had previously been located in other Titles of the United States Code, the prohibition against obscene, indecent, and profane broadcasts was removed from the Communications Act and re-enacted as § 1464 of Title 18. 62 Stat. 769 and 866. That rearrangement of the Code cannot reasonably be interpreted as having been intended to change the meaning of the anticensorship provision. H. R. Rep. No. 304, 80th Cong., 1st Sess., A106 (1947). Cf. *Tidewater Oil Co.* v. *United States,* 409 U. S. 151, 162.

We conclude, therefore, that § 326 does not limit the Commission's authority to impose sanctions on licensees who engage in obscene, indecent, or profane broadcasting.

### III

The only other statutory question presented by this case is whether the afternoon broadcast of the "Filthy Words"

---

[12] See, *e. g.,* 67 Cong. Rec. 12615 (1926) (remarks of Sen. Dill); *id.,* at 5480 (remarks of Rep. White); 68 Cong. Rec. 2567 (1927) (remarks of Rep. Scott); Hearings on S. 1 and S. 1754 before the Senate Committee on Interstate Commerce, 69th Cong., 1st Sess., 121 (1926); Hearings on H. R. 5589 before the House Committee on the Merchant Marine and Fisheries, 69th Cong., 1st Sess., 26 and 40 (1926). See also Hearings on H. R. 8825 before the House Committee on the Merchant Marine and Fisheries, 70th Cong., 1st Sess., *passim* (1928).

monologue was indecent within the meaning of § 1464.[13] Even that question is narrowly confined by the arguments of the parties.

The Commission identified several words that referred to excretory or sexual activities or organs, stated that the repetitive, deliberate use of those words in an afternoon broadcast when children are in the audience was patently offensive, and held that the broadcast was indecent. Pacifica takes issue with the Commission's definition of indecency, but does not dispute the Commission's preliminary determination that each of the components of its definition was present. Specifically, Pacifica does not quarrel with the conclusion that this afternoon broadcast was patently offensive. Pacifica's claim that the broadcast was not indecent within the meaning of the statute rests entirely on the absence of prurient appeal.

The plain language of the statute does not support Pacifica's argument. The words "obscene, indecent, or profane" are

[13] In addition to § 1464, the Commission also relied on its power to regulate in the public interest under 47 U. S. C. § 303 (g). We do not need to consider whether § 303 may have independent significance in a case such as this. The statutes authorizing civil penalties incorporate § 1464, a criminal statute. See 47 U. S. C. §§ 312 (a) (6), 312 (b) (2), and 503 (b) (1) (E) (1970 ed. and Supp. V). But the validity of the civil sanctions is not linked to the validity of the criminal penalty. The legislative history of the provisions establishes their independence. As enacted in 1927 and 1934, the prohibition on indecent speech was separate from the provisions imposing civil and criminal penalties for violating the prohibition. Radio Act of 1927, §§ 14, 29, and 33, 44 Stat. 1168 and 1173; Communications Act of 1934, §§ 312, 326, and 501, 48 Stat. 1086, 1091, and 1100, 47 U. S. C. §§ 312, 326, and 501 (1970 ed. and Supp. V). The 1927 and 1934 Acts indicated in the strongest possible language that any invalid provision was separable from the rest of the Act. Radio Act of 1927, § 38, 44 Stat. 1174; Communications Act of 1934, § 608, 48 Stat. 1105, 47 U. S. C. § 608. Although the 1948 codification of the criminal laws and the addition of new civil penalties changes the statutory structure, no substantive change was apparently intended. Cf. *Tidewater Oil Co.* v. *United States,* 409 U. S. 151, 162. Accordingly, we need not consider any question relating to the possible application of § 1464 as a criminal statute.

written in the disjunctive, implying that each has a separate meaning. Prurient appeal is an element of the obscene, but the normal definition of "indecent" merely refers to nonconformance with accepted standards of morality.[14]

Pacifica argues, however, that this Court has construed the term "indecent" in related statutes to mean "obscene," as that term was defined in *Miller* v. *California,* 413 U. S. 15. Pacifica relies most heavily on the construction this Court gave to 18 U. S. C. § 1461 in *Hamling* v. *United States,* 418 U. S. 87. See also *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123, 130 n. 7 (18 U. S. C. § 1462) (dicta). *Hamling* rejected a vagueness attack on § 1461, which forbids the mailing of "obscene, lewd, lascivious, indecent, filthy or vile" material. In holding that the statute's coverage is limited to obscenity, the Court followed the lead of Mr. Justice Harlan in *Manual Enterprises, Inc.* v. *Day,* 370 U. S. 478. In that case, Mr. Justice Harlan recognized that § 1461 contained a variety of words with many shades of meaning.[15] Nonetheless, he thought that the phrase "obscene, lewd, lascivious, indecent, filthy or vile," taken as a whole, was clearly limited to the obscene, a reading well grounded in prior judicial constructions: "[T]he statute since its inception has always been taken as aimed at obnoxiously debasing portrayals of sex." 370 U. S., at 483. In *Hamling* the Court agreed with Mr. Justice Harlan that § 1461 was meant only to regulate obscenity in the mails; by reading into it the limits set by *Miller* v. *California, supra,* the Court adopted a construction which assured the statute's constitutionality.

---

[14] Webster defines the term as "a: altogether unbecoming: contrary to what the nature of things or what circumstances would dictate as right or expected or appropriate: hardly suitable: UNSEEMLY . . . b: not conforming to generally accepted standards of morality: . . . ." Webster's Third New International Dictionary (1966).

[15] Indeed, at one point, he used "indecency" as a shorthand term for "patent offensiveness," 370 U. S., at 482, a usage strikingly similar to the Commission's definition in this case. 56 F. C. C. 2d, at 98.

The reasons supporting *Hamling*'s construction of § 1461 do not apply to § 1464. Although the history of the former revealed a primary concern with the prurient, the Commission has long interpreted § 1464 as encompassing more than the obscene.[16] The former statute deals primarily with printed matter enclosed in sealed envelopes mailed from one individual to another; the latter deals with the content of public broadcasts. It is unrealistic to assume that Congress intended to impose precisely the same limitations on the dissemination of patently offensive matter by such different means.[17]

Because neither our prior decisions nor the language or history of § 1464 supports the conclusion that prurient appeal is an essential component of indecent language, we reject Pacifica's construction of the statute. When that construction is put to one side, there is no basis for disagreeing with the Commission's conclusion that indecent language was used in this broadcast.

---

[16] " '[W]hile a nudist magazine may be within the protection of the First Amendment . . . the televising of nudes might well raise a serious question of programming contrary to 18 U. S. C. § 1464. . . . Similarly, regardless of whether the "4-letter words" and sexual description, set forth in *"lady Chatterly's Lover,"* (when considered in the context of the whole book) make the book obscene for mailability purposes, the utterance of such words or the depiction of such sexual activity on radio or TV would raise similar public interest and section 1464 questions.'" *Enbanc Programing Inquiry*, 44 F. C. C. 2303, 2307 (1960). See also *In re WUHY-FM*, 24 F. C. C. 2d 408, 412 (1970); *In re Sonderling Broadcasting Corp.*, 27 R. R. 2d 285, on reconsideration, 41 F. C. C. 2d 777 (1973), aff'd on other grounds *sub nom. Illinois Citizens Committee for Broadcasting* v. *FCC*, 169 U. S. App. D. C. 166, 515 F. 2d 397 (1974); *In re Mile High Stations, Inc.*, 28 F. C. C. 795 (1960); *In re Palmetto Broadcasting Co.*, 33 F. C. C. 250 (1962), reconsideration denied, 34 F. C. C. 101 (1963), aff'd on other grounds *sub nom. Robinson* v. *FCC*, 118 U. S. App. D. C. 144, 334 F. 2d 534 (1964), cert. denied, 379 U. S. 843.

[17] This conclusion is reinforced by noting the different constitutional limits on Congress' power to regulate the two different subjects. Use of the postal power to regulate material that is not fraudulent or obscene

## IV

Pacifica makes two constitutional attacks on the Commission's order. First, it argues that the Commission's construction of the statutory language broadly encompasses so much constitutionally protected speech that reversal is required even if Pacifica's broadcast of the "Filthy Words" monologue is not itself protected by the First Amendment. Second, Pacifica argues that inasmuch as the recording is not obscene, the Constitution forbids any abridgment of the right to broadcast it on the radio.

### A

The first argument fails because our review is limited to the question whether the Commission has the authority to proscribe this particular broadcast. As the Commission itself emphasized, its order was "issued in a specific factual context." 59 F. C. C. 2d, at 893. That approach is appropriate for courts as well as the Commission when regulation of indecency is at stake, for indecency is largely a function of context—it cannot be adequately judged in the abstract.

The approach is also consistent with *Red Lion Broadcasting Co. v. FCC*, 395 U. S. 367. In that case the Court rejected an argument that the Commission's regulations defining the fairness doctrine were so vague that they would inevitably abridge the broadcasters' freedom of speech. The Court of Appeals had invalidated the regulations because their vagueness might lead to self-censorship of controversial program

---

raises "grave constitutional questions." *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 156. But it is well settled that the First Amendment has a special meaning in the broadcasting context. See, *e. g.*, *FCC* v. *National Citizens Committee for Broadcasting*, 436 U. S. 775; *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367; *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94. For this reason, the presumption that Congress never intends to exceed constitutional limits, which supported *Hamling*'s narrow reading of § 1461, does not support a comparable reading of § 1464.

content. *Radio Television News Directors Assn.* v. *United States,* 400 F. 2d 1002, 1016 (CA7 1968). This Court reversed. After noting that the Commission had indicated, as it has in this case, that it would not impose sanctions without warning in cases in which the applicability of the law was unclear, the Court stated:

> "We need not approve every aspect of the fairness doctrine to decide these cases, and we will not now pass upon the constitutionality of these regulations by envisioning the most extreme applications conceivable, *United States* v. *Sullivan,* 332 U. S. 689, 694 (1948), but will deal with those problems if and when they arise." 395 U. S., at 396.

It is true that the Commission's order may lead some broadcasters to censor themselves. At most, however, the Commission's definition of indecency will deter only the broadcasting of patently offensive references to excretory and sexual organs and activities.[18] While some of these references may be protected, they surely lie at the periphery of First Amendment concern. Cf. *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 380–381. *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 61. The danger dismissed so summarily in *Red Lion,* in contrast, was that broadcasters would respond to the vagueness of the regulations by refusing to present programs dealing with important social and political controversies. Invalidating any rule on the basis of its hypothetical application to situations not before the Court is "strong medicine" to be applied "sparingly and only as a last resort." *Broadrick* v. *Oklahoma,* 413 U. S. 601, 613. We decline to administer that medicine to preserve the vigor of patently offensive sexual and excretory speech.

---

[18] A requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication. There are few, if any, thoughts that cannot be expressed by the use of less offensive language.

## B

When the issue is narrowed to the facts of this case, the question is whether the First Amendment denies government any power to restrict the public broadcast of indecent language in any circumstances.[19] For if the government has any such power, this was an appropriate occasion for its exercise.

The words of the Carlin monologue are unquestionably "speech" within the meaning of the First Amendment. It is equally clear that the Commission's objections to the broadcast were based in part on its content. The order must therefore fall if, as Pacifica argues, the First Amendment prohibits all governmental regulation that depends on the content of speech. Our past cases demonstrate, however, that no such absolute rule is mandated by the Constitution.

The classic exposition of the proposition that both the content and the context of speech are critical elements of First Amendment analysis is Mr. Justice Holmes' statement for the Court in *Schenck* v. *United States,* 249 U. S. 47, 52:

> "We admit that in many places and in ordinary times the defendants in saying all that was said in the circular would have been within their constitutional rights. But the character of every act depends upon the circumstances in which it is done. . . . The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words

---

[19] Pacifica's position would, of course, deprive the Commission of any power to regulate erotic telecasts unless they were obscene under *Miller* v. *California,* 413 U. S. 15. Anything that could be sold at a newsstand for private examination could be publicly displayed on television.

We are assured by Pacifica that the free play of market forces will discourage indecent programming. "Smut may," as Judge Leventhal put it, "drive itself from the market and confound Gresham," 181 U. S. App. D. C., at 158, 556 F. 2d, at 35; the prosperity of those who traffic in pornographic literature and films would appear to justify skepticism.

that may have all the effect of force. . . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

Other distinctions based on content have been approved in the years since *Schenck*. The government may forbid speech calculated to provoke a fight. See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. It may pay heed to the " 'commonsense differences' between commercial speech and other varieties." *Bates* v. *State Bar of Arizona, supra,* at 381. It may treat libels against private citizens more severely than libels against public officials. See *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323. Obscenity may be wholly prohibited. *Miller* v. *California,* 413 U. S. 15. And only two Terms ago we refused to hold that a "statutory classification is unconstitutional because it is based on the content of communication protected by the First Amendment." *Young* v. *American Mini Theatres, Inc., supra,* at 52.

The question in this case is whether a broadcast of patently offensive words dealing with sex and excretion may be regulated because of its content.[20] Obscene materials have been denied the protection of the First Amendment because their content is so offensive to contemporary moral standards. *Roth* v. *United States,* 354 U. S. 476. But the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of

---

[20] Although neither MR. JUSTICE POWELL nor MR. JUSTICE BRENNAN directly confronts this question, both have answered it affirmatively, the latter explicitly, *post,* at 768 n. 3, and the former implicitly by concurring in a judgment that could not otherwise stand.

ideas.[21]   If there were any reason to believe that the Commission's characterization of the Carlin monologue as offensive could be traced to its political content—or even to the fact that it satirized contemporary attitudes about four-letter words [22]— First Amendment protection might be required.   But that is simply not this case.   These words offend for the same reasons that obscenity offends.[23]   Their place in the hierarchy of First Amendment values was aptly sketched by Mr. Justice Murphy when he said: "[S]uch utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky* v. *New Hampshire,* 315 U. S., at 572.

Although these words ordinarily lack literary, political, or scientific value, they are not entirely outside the protection of the First Amendment.   Some uses of even the most offensive words are unquestionably protected.   See, *e. g., Hess* v. *Indiana,* 414 U. S. 105.   Indeed, we may assume, *arguendo,* that this monologue would be protected in other contexts.   None-

---

[21] See, *e. g., Madison School District* v. *Wisconsin Employment Relations Comm'n,* 429 U. S. 167, 175–176; *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765.

[22] The monologue does present a point of view; it attempts to show that the words it uses are "harmless" and that our attitudes toward them are "essentially silly." See *supra,* at 730.   The Commission objects, not to this point of view, but to the way in which it is expressed.   The belief that these words are harmless does not necessarily confer a First Amendment privilege to use them while proselytizing, just as the conviction that obscenity is harmless does not license one to communicate that conviction by the indiscriminate distribution of an obscene leaflet.

[23] The Commission stated: "Obnoxious, gutter language describing these matters has the effect of debasing and brutalizing human beings by reducing them to their mere bodily functions . . . ."   56 F. C. C. 2d, at 98. Our society has a tradition of performing certain bodily functions in private, and of severely limiting the public exposure or discussion of such matters.   Verbal or physical acts exposing those intimacies are offensive irrespective of any message that may accompany the exposure.

theless, the constitutional protection accorded to a communication containing such patently offensive sexual and excretory language need not be the same in every context.[24] It is a characteristic of speech such as this that both its capacity to offend and its "social value," to use Mr. Justice Murphy's term, vary with the circumstances. Words that are commonplace in one setting are shocking in another. To paraphrase Mr. Justice Harlan, one occasion's lyric is another's vulgarity. Cf. *Cohen* v. *California*, 403 U. S. 15, 25.[25]

In this case it is undisputed that the content of Pacifica's broadcast was "vulgar," "offensive," and "shocking." Because content of that character is not entitled to absolute constitutional protection under all circumstances, we must consider its

---

[24] With respect to other types of speech, the Court has tailored its protection to both the abuses and the uses to which it might be put. See, *e. g., New York Times Co.* v. *Sullivan*, 376 U. S. 254 (special scienter rules in libel suits brought by public officials); *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (government may strictly regulate truthfulness in commercial speech). See also *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 82 n. 6 (POWELL, J., concurring).

[25] The importance of context is illustrated by the *Cohen* case. That case arose when Paul Cohen entered a Los Angeles courthouse wearing a jacket emblazoned with the words "Fuck the Draft." After entering the courtroom, he took the jacket off and folded it. 403 U. S., at 19 n. 3. So far as the evidence showed, no one in the courthouse was offended by his jacket. Nonetheless, when he left the courtroom, Cohen was arrested, convicted of disturbing the peace, and sentenced to 30 days in prison.

In holding that criminal sanctions could not be imposed on Cohen for his political statement in a public place, the Court rejected the argument that his speech would offend unwilling viewers; it noted that "there was no evidence that persons powerless to avoid [his] conduct did in fact object to it." *Id.*, at 22. In contrast, in this case the Commission was responding to a listener's strenuous complaint, and Pacifica does not question its determination that this afternoon broadcast was likely to offend listeners. It should be noted that the Commission imposed a far more moderate penalty on Pacifica than the state court imposed on Cohen. Even the strongest civil penalty at the Commission's command does not include criminal prosecution. See n. 1, *supra*.

context in order to determine whether the Commission's action was constitutionally permissible.

## C

We have long recognized that each medium of expression presents special First Amendment problems. *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 502–503. And of all forms of communication, it is broadcasting that has received the most limited First Amendment protection. Thus, although other speakers cannot be licensed except under laws that carefully define and narrow official discretion, a broadcaster may be deprived of his license and his forum if the Commission decides that such an action would serve "the public interest, convenience, and necessity." [26] Similarly, although the First Amendment protects newspaper publishers from being required to print the replies of those whom they criticize, *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, it affords no such protection to broadcasters; on the contrary, they must give free time to the victims of their criticism. *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367.

The reasons for these distinctions are complex, but two have relevance to the present case. First, the broadcast media have established a uniquely pervasive presence in the lives of all Americans. Patently offensive, indecent material presented over the airwaves confronts the citizen, not only in public, but also in the privacy of the home, where the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder. *Rowan* v. *Post Office Dept.,* 397 U. S. 728. Because the broadcast audience is constantly tuning in and out, prior warnings cannot completely protect the listener or viewer from unexpected program content. To say that one may avoid further offense by turning off the radio when he

---

[26] 47 U. S. C. §§ 309 (a), 312 (a) (2); *FCC* v. *WOKO, Inc.,* 329 U. S. 223, 229. Cf. *Shuttlesworth* v. *Birmingham,* 394 U. S. 147; *Staub* v. *Baxley,* 355 U. S. 313.

hears indecent language is like saying that the remedy for an assault is to run away after the first blow. One may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place.[27]

Second, broadcasting is uniquely accessible to children, even those too young to read. Although Cohen's written message might have been incomprehensible to a first grader, Pacifica's broadcast could have enlarged a child's vocabulary in an instant. Other forms of offensive expression may be withheld from the young without restricting the expression at its source. Bookstores and motion picture theaters, for example, may be prohibited from making indecent material available to children. We held in *Ginsberg* v. *New York*, 390 U. S. 629, that the government's interest in the "well-being of its youth" and in supporting "parents' claim to authority in their own household" justified the regulation of otherwise protected expression.

---

[27] Outside the home, the balance between the offensive speaker and the unwilling audience may sometimes tip in favor of the speaker, requiring the offended listener to turn away. See *Erznoznik* v. *Jacksonville*, 422 U. S. 205. As we noted in *Cohen* v. *California*:

"While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue . . . , we have at the same time consistently stressed that 'we are often "captives" outside the sanctuary of the home and subject to objectionable speech.' " 403 U. S., at 21.

The problem of harassing phone calls is hardly hypothetical. Congress has recently found it necessary to prohibit debt collectors from "plac[ing] telephone calls without meaningful disclosure of the caller's identity"; from "engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number"; and from "us[ing] obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." Consumer Credit Protection Act Amendments, 91 Stat. 877, 15 U. S. C. § 1692d (1976 ed., Supp. II).

*Id.,* at 640 and 639.[28] The ease with which children may obtain access to broadcast material, coupled with the concerns recognized in *Ginsberg,* amply justify special treatment of indecent broadcasting.

It is appropriate, in conclusion, to emphasize the narrowness of our holding. This case does not involve a two-way radio conversation between a cab driver and a dispatcher, or a telecast of an Elizabethan comedy. We have not decided that an occasional expletive in either setting would justify any sanction or, indeed, that this broadcast would justify a criminal prosecution. The Commission's decision rested entirely on a nuisance rationale under which context is all-important. The concept requires consideration of a host of variables. The time of day was emphasized by the Commission. The content of the program in which the language is used will also affect the composition of the audience,[29] and differences between radio, television, and perhaps closed-circuit transmissions, may also be relevant. As Mr. Justice Sutherland wrote, a "nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard." *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388. We simply hold that when the Commission finds that a pig has entered the parlor, the exercise

---

[28] The Commission's action does not by any means reduce adults to hearing only what is fit for children. Cf. *Butler* v. *Michigan,* 352 U. S. 380, 383. Adults who feel the need may purchase tapes and records or go to theaters and nightclubs to hear these words. In fact, the Commission has not unequivocally closed even broadcasting to speech of this sort; whether broadcast audiences in the late evening contain so few children that playing this monologue would be permissible is an issue neither the Commission nor this Court has decided.

[29] Even a prime-time recitation of Geoffrey Chaucer's Miller's Tale would not be likely to command the attention of many children who are both old enough to understand and young enough to be adversely affected by passages such as: "And prively he caughte hire by the queynte." The Canterbury Tales, Chaucer's Complete Works (Cambridge ed. 1933), p. 58, l. 3276.

of its regulatory power does not depend on proof that the pig is obscene.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

The following is a verbatim transcript of "Filthy Words" prepared by the Federal Communications Commission.

Aruba-du, ruba-tu, ruba-tu. I was thinking about the curse words and the swear words, the cuss words and the words that you can't say, that you're not supposed to say all the time, [']cause words or people into words want to hear your words. Some guys like to record your words and sell them back to you if they can, (laughter) listen in on the telephone, write down what words you say. A guy who used to be in Washington knew that his phone was tapped, used to answer, Fuck Hoover, yes, go ahead. (laughter) Okay, I was thinking one night about the words you couldn't say on the public, ah, airwaves, um, the ones you definitely wouldn't say, ever, [']cause I heard a lady say bitch one night on television, and it was cool like she was talking about, you know, ah, well, the bitch is the first one to notice that in the litter Johnie right (murmur) Right. And, uh, bastard you can say, and hell and damn so I have to figure out which ones you couldn't and ever and it came down to seven but the list is open to amendment, and in fact, has been changed, uh, by now, ha, a lot of people pointed things out to me, and I noticed some myself. The original seven words were, shit, piss, fuck, cunt, cocksucker, motherfucker, and tits. Those are the ones that will curve your spine, grow hair on your hands and (laughter) maybe, even bring us, God help us, peace without honor (laughter) um, and a bourbon. (laughter) And now the first thing that we noticed was that word fuck was really repeated in there because the word motherfucker is a compound word and it's another form of the word fuck. (laughter) You want to be a purist it

doesn't really—it can't be on the list of basic words. Also, cocksucker is a compound word and neither half of that is really dirty. The word—the half sucker that's merely suggestive (laughter) and the word cock is a half-way dirty word, 50% dirty—dirty half the time, depending on what you mean by it. (laughter) Uh, remember when you first heard it, like in 6th grade, you used to giggle. And the cock crowed three times, heh (laughter) the cock—three times. It's in the Bible, cock in the Bible. (laughter) And the first time you heard about a cock-fight, remember—What? Huh? naw. It ain't that, are you stupid? man. (laughter, clapping) It's chickens, you know, (laughter) Then you have the four letter words from the old Anglo-Saxon fame. Uh, shit and fuck. The word shit, uh, is an interesting kind of word in that the middle class has never really accepted it and approved it. They use it like, crazy but it's not really okay. It's still a rude, dirty, old kind of gushy word. (laughter) They don't like that, but they say it, like, they say it like, a lady now in a middle-class home, you'll hear most of the time she says it as an expletive, you know, it's out of her mouth before she knows. She says, Oh shit oh shit, (laughter) oh shit. If she drops something, Oh, the shit hurt the broccoli. Shit. Thank you. (footsteps fading away) (papers ruffling)

Read it! (from audience)

Shit! (laughter) I won the Grammy, man, for the comedy album. Isn't that groovy? (clapping, whistling) (murmur) That's true. Thank you. Thank you man. Yeah. (murmur) (continuous clapping) Thank you man. Thank you. Thank you very much, man. Thank, no, (end of continuous clapping) for that and for the Grammy, man, [']cause (laughter) that's based on people liking it man, yeh, that's ah, that's okay man. (laughter) Let's let that go, man. I got my Grammy. I can let my hair hang down now, shit. (laughter) Ha! So! Now the word shit is okay for the man. At work you can say it like crazy. Mostly figuratively, Get that shit out of here,

will ya? I don't want to see that shit anymore. I can't *cut* that shit, buddy. I've had that shit up to here. I think you're full of shit myself. (laughter) He don't know shit from Shinola. (laughter) you know that? (laughter) Always wondered how the Shinola people felt about that (laughter) Hi, I'm the new man from Shinola. (laughter) Hi, how are ya? Nice to see ya. (laughter) How are ya? (laughter) Boy, I don't know whether to shit or wind my watch. (laughter) Guess, I'll shit on my watch. (laughter) Oh, *the* shit is going to hit *de* fan. (laughter) Built like a brick shit-house. (laughter) Up, he's up shit's creek. (laughter) He's had it. (laughter) He hit me, I'm sorry. (laughter) Hot shit, holy shit, tough shit, eat shit, (laughter) shit-eating grin. Uh, whoever thought of that was ill. (murmur laughter) He had a shit-eating grin! He had a what? (laughter) Shit on a stick. (laughter) Shit in a handbag. I always like that. He ain't worth shit in a handbag. (laughter) Shitty. He acted real shitty. (laughter) You know what I mean? (laughter) I got the money back, but a real shitty attitude. Heh, he had a shit-fit. (laughter) Wow! Shit-fit. Whew! Glad I wasn't there. (murmur, laughter) All the animals—Bull shit, horse shit, cow shit, rat shit, bat shit. (laughter) First time I heard bat shit, I really came apart. A guy in Oklahoma, Boggs, said it, man. Aw! Bat shit. (laughter) Vera reminded me of that last night, ah (murmur). Snake shit, slicker than owl shit. (laughter) Get your shit together. Shit or get off the pot. (laughter) I got a shit-load full of them. (laughter) I got a shit-pot full, all right. Shit-head, shit-heel, shit in your heart, shit for brains, (laughter) shit-face, heh (laughter) I always try to think how that could have originated; the first guy that said that. Somebody got drunk and fell in some shit, you know. (laughter) Hey, I'm shit-face. (laughter) Shit-face, *today*. (laughter) Anyway, enough of that shit. (laughter) The big one, the word fuck that's the one that hangs them up the most. [']Cause in a lot of cases that's the very act that

hangs them up the most. So, it's natural that the word would, uh, have the same effect. It's a great word, fuck, nice word, easy word, cute word, kind of. Easy word to say. One syllable, short u. (laughter) Fuck. (Murmur) You know, it's easy. Starts with a nice soft sound fuh ends with a *kuh*. Right? (laughter) A little something for everyone. Fuck (laughter) Good word. Kind of a proud word, too. Who are you? I am *FUCK*. (laughter) *FUCK OF THE MOUNTAIN*. (laughter) Tune in again next week to FUCK OF THE MOUNTAIN. (laughter) It's an interesting word too, [']cause it's got a double kind of a life—personality—dual, you know, whatever the right phrase is. It leads a double life, the word fuck. First of all, it means, sometimes, most of the time, fuck. What does it mean? It means to make love. Right? We're going to make love, yeh, we're going to fuck, yeh, we're going to fuck, yeh, we're going to make love. (laughter) we're really going to fuck, yeh, we're going to make love. Right? And it also means the beginning of life, it's the act that begins life, so there's the word hanging around with words like love, and life, and yet on the other hand, it's also a word that we really use to hurt each other with, man. It's a heavy. It's one that you have toward the end of the argument. (laughter) Right? (laughter) You finally can't make out. Oh, fuck you man. I said, fuck you. (laughter, murmur) Stupid fuck. (laughter) Fuck you and everybody that looks like you. (laughter) man. It would be nice to change the movies that we already have and substitute the word fuck for the word kill, wherever we could, and some of those movie cliches would change a little bit. Madfuckers still on the loose. Stop me before I fuck again. Fuck the ump, fuck the ump, fuck the ump, fuck the ump, fuck the ump. Easy on the clutch Bill, you'll fuck that engine again. (laughter) The other shit one was, I don't give a shit. Like it's worth something, you know? (laughter) I don't give a shit. Hey, well, I don't take no shit, (laughter) you know what I mean? You know why I don't take no shit? (laughter)

[']Cause I don't give a shit. (laughter)   If I give a shit, I would have to pack shit. (laughter)   But I don't pack no shit cause I don't give a shit. (laughter)   You wouldn't shit me, would you? (laughter)   That's a joke when you're a kid with a worm looking out the bird's ass.   You wouldn't shit me, would you? (laughter)   It's an eight-year-old joke but a good one. (laughter)   The additions to the list.   I found three more words that had to be put on the list of words you could never say on television, and they were fart, turd and twat, those three. (laughter)   Fart, we talked about, it's harmless It's like tits, it's a cutie word, no problem.   Turd, you can't say but who wants to, you know? (laughter)   The subject never comes up on the panel so I'm not worried about that one. Now the word twat is an interesting word.   Twat!   Yeh, right in the twat. (laughter)   Twat is an interesting word because it's the only one I know of, the only slang word applying to the, a part of the sexual anatomy that doesn't have another meaning to it.   Like, ah, snatch, box and pussy all have other meanings, man.   Even in a Walt Disney movie, you can say, We're going to snatch that pussy and put him in a box and bring him on the airplane. (murmur, laughter) Everybody loves it.   The twat stands alone, man, as it should. And two-way words.   Ah, ass is okay providing you're riding into town on a religious feast day. (laughter)   You can't say, up your *ass*. (laughter)   You can say, stuff it! (murmur) There are certain things you can say its weird but you can just come so close.   Before I cut, I, uh, want to, ah, thank you for listening to my words, man, fellow, uh space travelers.   Thank you man for tonight and thank you also. (clapping whistling)

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACKMUN joins, concurring in part and concurring in the judgment.

I join Parts I, II, III, and IV–C of MR. JUSTICE STEVENS' opinion.   The Court today reviews only the Commission's holding that Carlin's monologue was indecent "as broadcast"

at two o'clock in the afternoon, and not the broad sweep of the Commission's opinion. *Ante,* at 734–735. In addition to being consistent with our settled practice of not deciding constitutional issues unnecessarily, see *ante,* at 734; *Ashwander* v. *TVA,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring), this narrow focus also is conducive to the orderly development of this relatively new and difficult area of law, in the first instance by the Commission, and then by the reviewing courts. See 181 U. S. App. D. C. 132, 158–160, 556 F. 2d 9, 35–37 (1977) (Leventhal, J., dissenting).

I also agree with much that is said in Part IV of MR. JUSTICE STEVENS' opinion, and with its conclusion that the Commission's holding in this case does not violate the First Amendment. Because I do not subscribe to all that is said in Part IV, however, I state my views separately.

## I

It is conceded that the monologue at issue here is not obscene in the constitutional sense. See 56 F. C. C. 2d 94, 98 (1975); Brief for Petitioner 18. Nor, in this context, does its language constitute "fighting words" within the meaning of *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942). Some of the words used have been held protected by the First Amendment in other cases and contexts. *E. g., Lewis* v. *New Orleans,* 415 U. S. 130 (1974); *Hess* v. *Indiana,* 414 U. S. 105 (1973); *Papish* v. *University of Missouri Curators,* 410 U. S. 667 (1973); *Cohen* v. *California,* 403 U. S. 15 (1971); see also *Eaton* v. *Tulsa,* 415 U. S. 697 (1974). I do not think Carlin, consistently with the First Amendment, could be punished for delivering the same monologue to a live audience composed of adults who, knowing what to expect, chose to attend his performance. See *Brown* v. *Oklahoma,* 408 U. S. 914 (1972) (POWELL, J., concurring in result). And I would assume that an adult could not constitutionally be prohibited from purchasing a recording or transcript of the monologue

and playing or reading it in the privacy of his own home.   Cf. *Stanley* v. *Georgia,* 394 U. S. 557 (1969).

But it also is true that the language employed is, to most people, vulgar and offensive.   It was chosen specifically for this quality, and it was repeated over and over as a sort of verbal shock treatment.   The Commission did not err in characterizing the narrow category of language used here as "patently offensive" to most people regardless of age.

The issue, however, is whether the Commission may impose civil sanctions on a licensee radio station for broadcasting the monologue at two o'clock in the afternoon.   The Commission's primary concern was to prevent the broadcast from reaching the ears of unsupervised children who were likely to be in the audience at that hour.   In essence, the Commission sought to "channel" the monologue to hours when the fewest unsupervised children would be exposed to it.   See 56 F. C. C. 2d, at 98.   In my view, this consideration provides strong support for the Commission's holding.[1]

The Court has recognized society's right to "adopt more stringent controls on communicative materials available to youths than on those available to adults."   *Erznoznik* v. *Jacksonville,* 422 U. S. 205, 212 (1975); see also, *e. g., Miller* v. *California,* 413 U. S. 15, 36 n. 17 (1973); *Ginsberg* v. *New York,* 390 U. S. 629, 636–641 (1968); *Jacobellis* v. *Ohio,* 378 U. S. 184, 195 (1964) (opinion of BRENNAN, J.).   This recognition stems in large part from the fact that "a child . . . is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Ginsberg* v. *New York, supra,* at 649–650 (STEWART, J., concurring in result).   Thus, children may not be able to protect themselves from speech which, although shocking to most adults, generally may be avoided by the unwilling

---

[1] See generally Judge Leventhal's thoughtful opinion in the Court of Appeals.   181 U. S. App. D. C. 132, 155–158, 556 F. 2d 9, 32–35 (1977) (dissenting opinion).

through the exercise of choice. At the same time, such speech may have a deeper and more lasting negative effect on a child than on an adult. For these reasons, society may prevent the general dissemination of such speech to children, leaving to parents the decision as to what speech of this kind their children shall hear and repeat:

> "[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince* v. *Massachusetts,* [321 U. S. 158, 166 (1944)]. The legislature could properly conclude that parents and others, teachers for example, who have this primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." *Id.,* at 639.

The Commission properly held that the speech from which society may attempt to shield its children is not limited to that which appeals to the youthful prurient interest. The language involved in this case is as potentially degrading and harmful to children as representations of many erotic acts.

In most instances, the dissemination of this kind of speech to children may be limited without also limiting willing adults' access to it. Sellers of printed and recorded matter and exhibitors of motion pictures and live performances may be required to shut their doors to children, but such a requirement has no effect on adults' access. See *id.,* at 634–635. The difficulty is that such a physical separation of the audience cannot be accomplished in the broadcast media. During most of the broadcast hours, both adults and unsupervised children are likely to be in the broadcast audience, and the broadcaster cannot reach willing adults without also reaching

children. This, as the Court emphasizes, is one of the distinctions between the broadcast and other media to which we often have adverted as justifying a different treatment of the broadcast media for First Amendment purposes. See *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 384 (1977); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 101 (1973); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 386–387 (1969); *Capital Broadcasting Co.* v. *Mitchell,* 333 F. Supp. 582 (DC 1971), aff'd *sub nom. Capital Broadcasting Co.* v. *Acting Attorney General,* 405 U. S. 1000 (1972); see generally *Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 502–503 (1952). In my view, the Commission was entitled to give substantial weight to this difference in reaching its decision in this case.

A second difference, not without relevance, is that broadcasting—unlike most other forms of communication—comes directly into the home, the one place where people ordinarily have the right not to be assaulted by uninvited and offensive sights and sounds. *Erznoznik* v. *Jacksonville, supra,* at 209; *Cohen* v. *California,* 403 U. S., at 21; *Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970). Although the First Amendment may require unwilling adults to absorb the first blow of offensive but protected speech when they are in public before they turn away, see, *e. g., Erznoznik, supra,* at 210–211, but cf. *Rosenfeld* v. *New Jersey,* 408 U. S. 901, 903–909 (1972) (POWELL, J., dissenting), a different order of values obtains in the home. "That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech and other sound does not mean we must be captives everywhere." *Rowan* v. *Post Office Dept., supra,* at 738. The Commission also was entitled to give this factor appropriate weight in the circumstances of the instant case. This is not to say, however, that the Commission has an unrestricted license to decide what speech, protected in other media, may be banned from the airwaves in order to protect

unwilling adults from momentary exposure to it in their homes.[2] Making the sensitive judgments required in these cases is not easy. But this responsibility has been reposed initially in the Commission, and its judgment is entitled to respect.

It is argued that despite society's right to protect its children from this kind of speech, and despite everyone's interest in not being assaulted by offensive speech in the home, the Commission's holding in this case is impermissible because it prevents willing adults from listening to Carlin's monologue over the radio in the early afternoon hours. It is said that this ruling will have the effect of "reduc[ing] the adult population . . . to [hearing] only what is fit for children." *Butler* v. *Michigan,* 352 U. S. 380, 383 (1957). This argument is not without force. The Commission certainly should consider it as it develops standards in this area. But it is not sufficiently strong to leave the Commission powerless to act in circumstances such as those in this case.

The Commission's holding does not prevent willing adults from purchasing Carlin's record, from attending his performances, or, indeed, from reading the transcript reprinted as an appendix to the Court's opinion. On its face, it does not prevent respondent Pacifica Foundation from broadcasting the monologue during late evening hours when fewer children are likely to be in the audience, nor from broadcasting discussions of the contemporary use of language at any time during the day. The Commission's holding, and certainly the Court's holding today, does not speak to cases involving the isolated

---

[2] It is true that the radio listener quickly may tune out speech that is offensive to him. In addition, broadcasters may preface potentially offensive programs with warnings. But such warnings do not help the unsuspecting listener who tunes in at the middle of a program. In this respect, too, broadcasting appears to differ from books and records, which may carry warnings on their face, and from motion pictures and live performances, which may carry warnings on their marquees.

use of a potentially offensive word in the course of a radio broadcast, as distinguished from the verbal shock treatment administered by respondent here. In short, I agree that on the facts of this case, the Commission's order did not violate respondent's First Amendment rights.

## II

As the foregoing demonstrates, my views are generally in accord with what is said in Part IV–C of MR. JUSTICE STEVENS' opinion. See *ante,* at 748–750. I therefore join that portion of his opinion. I do not join Part IV–B, however, because I do not subscribe to the theory that the Justices of this Court are free generally to decide on the basis of its content which speech protected by the First Amendment is most "valuable" and hence deserving of the most protection, and which is less "valuable" and hence deserving of less protection. Compare *ante,* at 744–748; *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50, 63–73 (1976) (opinion of STEVENS, J.), with *id.,* at 73 n. 1 (POWELL, J., concurring).[3] In my view, the result in this case does not turn on whether Carlin's monologue, viewed as a whole, or the words that constitute it, have more or less "value" than a candidate's campaign speech. This is a judgment for each person to make, not one for the judges to impose upon him.[4]

---

[3] The Court has, however, created a limited exception to this rule in order to bring commercial speech within the protection of the First Amendment. See *Ohralik* v. *Ohio State Bar Assn.,* 436 U. S. 447, 455–456 (1978).

[4] For much the same reason, I also do not join Part IV–A. I had not thought that the application *vel non* of overbreadth analysis should depend on the Court's judgment as to the value of the protected speech that might be deterred. Cf. *ante,* at 743. Except in the context of commercial speech, see *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 380–381 (1977), it has not in the past. See, *e. g., Lewis* v. *New Orleans,* 415 U. S. 130 (1974); *Gooding* v. *Wilson,* 405 U. S. 518 (1972).

As MR. JUSTICE STEVENS points out, however, *ante,* at 734, the Commission's order was limited to the facts of this case; "it did not purport to

The result turns instead on the unique characteristics of the broadcast media, combined with society's right to protect its children from speech generally agreed to be inappropriate for their years, and with the interest of unwilling adults in not being assaulted by such offensive speech in their homes. Moreover, I doubt whether today's decision will prevent any adult who wishes to receive Carlin's message in Carlin's own words from doing so, and from making for himself a value judgment as to the merit of the message and words. Cf. *id.*, at 77–79 (POWELL, J., concurring). These are the grounds upon which I join the judgment of the Court as to Part IV.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

I agree with MR. JUSTICE STEWART that, under *Hamling* v. *United States*, 418 U. S. 87 (1974), and *United States* v. *12 200-ft. Reels of Film*, 413 U. S. 123 (1973), the word "indecent" in 18 U. S. C. § 1464 (1976 ed.) must be construed to prohibit only obscene speech. I would, therefore, normally refrain from expressing my views on any constitutional issues implicated in this case. However, I find the Court's misapplication of fundamental First Amendment principles so patent, and its attempt to impose *its* notions of propriety on the whole of the American people so misguided, that I am unable to remain silent.

I

For the second time in two years, see *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50 (1976), the Court refuses to embrace the notion, completely antithetical to basic First Amendment values, that the degree of protection the First

---

engage in formal rulemaking or in the promulgation of any regulations." In addition, since the Commission may be expected to proceed cautiously, as it has in the past, cf. Brief for Petitioner 42–43, and n. 31, I do not foresee an undue "chilling" effect on broadcasters' exercise of their rights. I agree, therefore, that respondent's overbreadth challenge is meritless.

Amendment affords protected speech varies with the social value ascribed to that speech by five Members of this Court. See opinion of MR. JUSTICE POWELL, *ante,* at 761–762. Moreover, as do all parties, all Members of the Court agree that the Carlin monologue aired by Station WBAI does not fall within one of the categories of speech, such as "fighting words," *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942), or obscenity, *Roth* v. *United States,* 354 U. S. 476 (1957), that is totally without First Amendment protection. This conclusion, of course, is compelled by our cases expressly holding that communications containing some of the words found condemnable here are fully protected by the First Amendment in other contexts. See *Eaton* v. *Tulsa,* 415 U. S. 697 (1974); *Papish* v. *University of Missouri Curators,* 410 U. S. 667 (1973); *Brown* v. *Oklahoma,* 408 U. S. 914 (1972); *Lewis* v. *New Orleans,* 408 U. S. 913 (1972); *Rosenfeld* v. *New Jersey,* 408 U. S. 901 (1972); *Cohen* v. *California,* 403 U. S. 15 (1971). Yet despite the Court's refusal to create a sliding scale of First Amendment protection calibrated to this Court's perception of the worth of a communication's content, and despite our unanimous agreement that the Carlin monologue is protected speech, a majority of the Court[1] nevertheless finds that, on the facts of this case, the FCC is not constitutionally barred from imposing sanctions on Pacifica for its airing of the Carlin monologue. This majority apparently believes that the FCC's disapproval of Pacifica's afternoon broadcast of Carlin's "Dirty Words" recording is a permissible time, place, and manner regulation. *Kovacs* v. *Cooper,* 336 U. S. 77 (1949). Both the opinion of my Brother STEVENS and the opinion of my Brother POWELL rely principally on two factors in reaching this conclusion: (1) the capacity of a radio broadcast to intrude into the unwilling listener's home,

---

[1] Where I refer without differentiation to the actions of "the Court," my reference is to this majority, which consists of my Brothers POWELL and STEVENS and those Members of the Court joining their separate opinions.

and (2) the presence of children in the listening audience. Dispassionate analysis, removed from individual notions as to what is proper and what is not, starkly reveals that these justifications, whether individually or together, simply do not support even the professedly moderate degree of governmental homogenization of radio communications—if, indeed, such homogenization can ever be moderate given the pre-eminent status of the right of free speech in our constitutional scheme—that the Court today permits.

## A

Without question, the privacy interests of an individual in his home are substantial and deserving of significant protection. In finding these interests sufficient to justify the content regulation of protected speech, however, the Court commits two errors. First, it misconceives the nature of the privacy interests involved where an individual voluntarily chooses to admit radio communications into his home. Second, it ignores the constitutionally protected interests of both those who wish to transmit and those who desire to receive broadcasts that many—including the FCC and this Court—might find offensive.

"The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections." *Cohen* v. *California, supra,* at 21. I am in wholehearted agreement with my Brethren that an individual's right "to be let alone" when engaged in private activity within the confines of his own home is encompassed within the "substantial privacy interests" to which Mr. Justice Harlan referred in *Cohen,* and is entitled to the greatest solicitude. *Stanley* v. *Georgia,* 394 U. S. 557 (1969). However, I believe that an individual's actions in switching on

and listening to communications transmitted over the public airways and directed to the public at large do not implicate fundamental privacy interests, even when engaged in within the home. Instead, because the radio is undeniably a public medium, these actions are more properly viewed as a decision to take part, if only as a listener, in an ongoing public discourse. See Note, Filthy Words, the FCC, and the First Amendment: Regulating Broadcast Obscenity, 61 Va. L. Rev. 579, 618 (1975). Although an individual's decision to allow public radio communications into his home undoubtedly does not abrogate all of his privacy interests, the residual privacy interests he retains vis-à-vis the communication he voluntarily admits into his home are surely no greater than those of the people present in the corridor of the Los Angeles courthouse in *Cohen* who bore witness to the words "Fuck the Draft" emblazoned across Cohen's jacket. Their privacy interests were held insufficient to justify punishing Cohen for his offensive communication.

Even if an individual who voluntarily opens his home to radio communications retains privacy interests of sufficient moment to justify a ban on protected speech if those interests are "invaded in an essentially intolerable manner," *Cohen* v. *California, supra,* at 21, the very fact that those interests are threatened only by a radio broadcast precludes any intolerable invasion of privacy; for unlike other intrusive modes of communication, such as sound trucks, "[t]he radio can be turned off," *Lehman* v. *Shaker Heights,* 418 U. S. 298, 302 (1974)— and with a minimum of effort. As Chief Judge Bazelon aptly observed below, "having elected to receive public air waves, the scanner who stumbles onto an offensive program is in the same position as the unsuspecting passers-by in *Cohen* and *Erznoznik* [v. *Jacksonville,* 422 U. S. 205 (1975)]; he can avert his attention by changing channels or turning off the set." 181 U. S. App. D. C. 132, 149, 556 F. 2d 9, 26 (1977). Whatever the minimal discomfort suffered by a

listener who inadvertently tunes into a program he finds offensive during the brief interval before he can simply extend his arm and switch stations or flick the "off" button, it is surely worth the candle to preserve the broadcaster's right to send, and the right of those interested to receive, a message entitled to full First Amendment protection. To reach a contrary balance, as does the Court, is clearly to follow MR. JUSTICE STEVENS' reliance on animal metaphors, *ante,* at 750–751, "to burn the house to roast the pig." *Butler* v. *Michigan,* 352 U. S. 380, 383 (1957).

The Court's balance, of necessity, fails to accord proper weight to the interests of listeners who wish to hear broadcasts the FCC deems offensive. It permits majoritarian tastes completely to preclude a protected message from entering the homes of a receptive, unoffended minority. No decision of this Court supports such a result. Where the individuals constituting the offended majority may freely choose to reject the material being offered, we have never found their privacy interests of such moment to warrant the suppression of speech on privacy grounds. Cf. *Lehman* v. *Shaker Heights, supra. Rowan* v. *Post Office Dept.,* 397 U. S. 728 (1970), relied on by the FCC and by the opinions of my Brothers POWELL and STEVENS, confirms rather than belies this conclusion. In *Rowan,* the Court upheld a statute, 39 U. S. C. § 4009 (1964 ed., Supp. IV), permitting householders to require that mail advertisers stop sending them lewd or offensive materials and remove their names from mailing lists. Unlike the situation here, householders who wished to receive the sender's communications were not prevented from doing so. Equally important, the determination of offensiveness *vel non* under the statute involved in *Rowan* was completely within the hands of the individual householder; no governmental evaluation of the worth of the mail's content stood between the mailer and the householder. In contrast, the visage of the censor is all too discernible here.

## B

Most parents will undoubtedly find understandable as well as commendable the Court's sympathy with the FCC's desire to prevent offensive broadcasts from reaching the ears of unsupervised children. Unfortunately, the facial appeal of this justification for radio censorship masks its constitutional insufficiency. Although the government unquestionably has a special interest in the well-being of children and consequently "can adopt more stringent controls on communicative materials available to youths than on those available to adults," *Erznoznik* v. *Jacksonville,* 422 U. S. 205, 212 (1975); see *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 106–107 (1973) (BRENNAN, J., dissenting), the Court has accounted for this societal interest by adopting a "variable obscenity" standard that permits the prurient appeal of material available to children to be assessed in terms of the sexual interests of minors. *Ginsberg* v. *New York,* 390 U. S. 629 (1968). It is true that the obscenity standard the *Ginsberg* Court adopted for such materials was based on the then-applicable obscenity standard of *Roth* v. *United States,* 354 U. S. 476 (1957), and *Memoirs* v. *Massachusetts,* 383 U. S. 413 (1966), and that "[w]e have not had occasion to decide what effect *Miller* [v. *California,* 413 U. S. 15 (1973)] will have on the *Ginsberg* formulation." *Erznoznik* v. *Jacksonville, supra,* at 213 n. 10. Nevertheless, we have made it abundantly clear that "under any test of obscenity as to minors . . . to be obscene 'such expression must be, in some significant way, erotic.'" 422 U. S., at 213 n. 10, quoting *Cohen* v. *California,* 403 U. S., at 20.

Because the Carlin monologue is obviously not an erotic appeal to the prurient interests of children, the Court, for the first time, allows the government to prevent minors from gaining access to materials that are not obscene, and are therefore protected, as to them.[2] It thus ignores our recent admoni-

---

[2] Even if the monologue appealed to the prurient interest of minors,

tion that "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." 422 U. S., at 213–214.[3] The Court's refusal to follow its own pronouncements is especially lamentable since it has the anomalous subsidiary effect, at least in the radio context at issue here, of making completely unavailable to adults material which may not constitutionally be kept even from children. This result violates in spades the principle of *Butler* v. *Michigan, supra.* *Butler* involved a challenge to a Michigan statute that forbade the publication, sale, or distribution of printed material "tending to incite minors to violent or depraved or immoral acts, manifestly tending to the corruption of the morals of youth." 352 U. S., at 381. Although *Roth* v. *United States, supra,* had not yet been decided, it is at least arguable that the material the statute in *Butler* was designed to suppress could have been constitutionally denied to children. Nevertheless, this Court

---

it would not be obscene as to them unless, as to them, "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller* v. *California,* 413 U. S. 15, 24 (1973).

[3] It may be that a narrowly drawn regulation prohibiting the use of offensive language on broadcasts directed specifically at younger children constitutes one of the "other legitimate proscription[s]" alluded to in *Erznoznik.* This is so both because of the difficulties inherent in adapting the *Miller* formulation to communications received by young children, and because such children are "not possessed of that full capacity for individual choice which is the presupposition of the First Amendment guarantees." *Ginsberg* v. *New York,* 390 U. S. 629, 649–650 (1968) (STEWART, J., concurring). I doubt, as my Brother STEVENS suggests, *ante,* at 745 n. 20, that such a limited regulation amounts to a regulation of speech based on its content, since, by hypothesis, the only persons at whom the regulated communication is directed are incapable of evaluating its content. To the extent that such a regulation is viewed as a regulation based on content, it marks the outermost limits to which content regulation is permissible.

found the statute unconstitutional. Speaking for the Court, Mr. Justice Frankfurter reasoned:

> "The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society." 352 U. S., at 383–384.

Where, as here, the government may not prevent the exposure of minors to the suppressed material, the principle of *Butler* applies *a fortiori*. The opinion of my Brother POWELL acknowledges that there lurks in today's decision a potential for " 'reduc[ing] the adult population . . . to [hearing] only what is fit for children,' " *ante,* at 760, but expresses faith that the FCC will vigilantly prevent this potential from ever becoming a reality. I am far less certain than my Brother POWELL that such faith in the Commission is warranted, see *Illinois Citizens Committee for Broadcasting* v. *FCC,* 169 U. S. App. D. C. 166, 187–190, 515 F. 2d 397, 418–421 (1975) (statement of Bazelon, C. J., as to why he voted to grant rehearing en banc); and even if I shared it, I could not so easily shirk the responsibility assumed by each Member of this Court jealously to guard against encroachments on First Amendment freedoms.

In concluding that the presence of children in the listening audience provides an adequate basis for the FCC to impose sanctions for Pacifica's broadcast of the Carlin monologue, the opinions of my Brother POWELL, *ante,* at 757–758, and my Brother STEVENS, *ante,* at 749–750, both stress the time-honored right of a parent to raise his child as he sees fit—a right this Court has consistently been vigilant to protect. See *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925). Yet this principle supports a

result directly contrary to that reached by the Court. *Yoder* and *Pierce* hold that parents, *not* the government, have the right to make certain decisions regarding the upbringing of their children. As surprising as it may be to individual Members of this Court, some parents may actually find Mr. Carlin's unabashed attitude towards the seven "dirty words" healthy, and deem it desirable to expose their children to the manner in which Mr. Carlin defuses the taboo surrounding the words. Such parents may constitute a minority of the American public, but the absence of great numbers willing to exercise the right to raise their children in this fashion does not alter the right's nature or its existence. Only the Court's regrettable decision does that.[4]

## C

As demonstrated above, neither of the factors relied on by both the opinion of my Brother POWELL and the opinion of my Brother STEVENS—the intrusive nature of radio and the presence of children in the listening audience—can, when taken on its own terms, support the FCC's disapproval of the Carlin monologue. These two asserted justifications are further plagued by a common failing: the lack of principled limits on their use as a basis for FCC censorship. No such limits come readily to mind, and neither of the opinions constituting the Court serve to clarify the extent to which the FCC may assert the privacy and children-in-the-audience rationales as justification for expunging from the airways protected communications the Commission finds offensive. Taken to their logical extreme, these rationales would support the cleansing of public

---

[4] The opinions of my Brothers POWELL and STEVENS rightly refrain from relying on the notion of "spectrum scarcity" to support their result. As Chief Judge Bazelon noted below, "although scarcity has justified *increasing* the diversity of speakers and speech, it has never been held to justify censorship." 181 U. S. App. D. C., at 152, 556 F. 2d, at 29 (emphasis in original). See *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 396 (1969).

radio of any "four-letter words" whatsoever, regardless of their context. The rationales could justify the banning from radio of a myriad of literary works, novels, poems, and plays by the likes of Shakespeare, Joyce, Hemingway, Ben Jonson, Henry Fielding, Robert Burns, and Chaucer; they could support the suppression of a good deal of political speech, such as the Nixon tapes; and they could even provide the basis for imposing sanctions for the broadcast of certain portions of the Bible.[5]

In order to dispel the specter of the possibility of so unpalatable a degree of censorship, and to defuse Pacifica's overbreadth challenge, the FCC insists that it desires only the authority to reprimand a broadcaster on facts analogous to those present in this case, which it describes as involving "broadcasting for nearly twelve minutes a record which repeated over and over words which depict sexual or excretory activities and organs in a manner patently offensive by its community's contemporary standards in the early afternoon when children were in the audience." Brief for Petitioner 45. The opinions of both my Brother POWELL and my Brother STEVENS take the FCC at its word, and consequently do no more than permit the Commission to censor the afternoon broadcast of the "sort of verbal shock treatment," opinion of MR. JUSTICE POWELL, *ante*, at 757, involved here. To insure that the FCC's regulation of protected speech does not exceed these bounds, my Brother POWELL is content to rely upon the judgment of the

---

[5] See, *e. g.*, I Samuel 25:22: "So and more also do God unto the enemies of David, if I leave of all that *pertain* to him by the morning light any that pisseth against the wall"; II Kings 18:27 and Isaiah 36:12: "[H]ath *he* not *sent me* to the men which sit on the wall, that they may eat their own dung, and drink their own piss with you?"; Ezekiel 23:3: "And they committed whoredoms in Egypt; they committed whoredoms in their youth; there were their breasts pressed, and there they bruised the teats of their virginity."; Ezekiel 23:21: "Thus thou calledst to remembrance the lewdnes of thy youth, in bruising thy teats by the Egyptians for the paps of thy youth." The Holy Bible (King James Version) (Oxford 1897).

Commission while my Brother STEVENS deems it prudent to rely on this Court's ability accurately to assess the worth of various kinds of speech.[6] For my own part, even accepting that this case is limited to its facts,[7] I would place the responsibility and the right to weed worthless and offensive communications from the public airways where it belongs and where, until today, it resided: in a public free to choose those communications worthy of its attention from a marketplace unsullied by the censor's hand.

## II

The absence of any hesitancy in the opinions of my Brothers POWELL and STEVENS to approve the FCC's censorship of the Carlin monologue on the basis of two demonstrably inadequate grounds is a function of their perception that the decision will result in little, if any, curtailment of communicative exchanges protected by the First Amendment. Although the extent to

---

[6] Although ultimately dependent upon the outcome of review in this Court, the approach taken by my Brother STEVENS would not appear to tolerate the FCC's suppression of any speech, such as political speech, falling within the core area of First Amendment concern. The same, however, cannot be said of the approach taken by my Brother POWELL, which, on its face, permits the Commission to censor even political speech if it is sufficiently offensive to community standards. A result more contrary to rudimentary First Amendment principles is difficult to imagine.

[7] Having insisted that it seeks to impose sanctions on radio communications only in the limited circumstances present here, I believe that the FCC is estopped from using either this decision or its own orders in this case, 56 F. C. C. 2d 94 (1975) and 59 F. C. C. 2d 892 (1976), as a basis for imposing sanctions on any public radio broadcast other than one aired during the daytime or early evening and containing the relentless repetition, for longer than a brief interval, of "language that describes, in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs." 56 F. C. C. 2d, at 98. For surely broadcasters are not now on notice that the Commission desires to regulate any offensive broadcast other than the type of "verbal shock treatment" condemned here, or even this "shock treatment" type of offensive broadcast during the late evening.

which the Court stands ready to countenance FCC censorship of protected speech is unclear from today's decision, I find the reasoning by which my Brethren conclude that the FCC censorship they approve will not significantly infringe on First Amendment values both disingenuous as to reality and wrong as a matter of law.

My Brother STEVENS, in reaching a result apologetically described as narrow, *ante,* at 750, takes comfort in his observation that "[a] requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication," *ante,* at 743 n. 18, and finds solace in his conviction that "[t]here are few, if any, thoughts that cannot be expressed by the use of less offensive language." *Ibid.* The idea that the content of a message and its potential impact on any who might receive it can be divorced from the words that are the vehicle for its expression is transparently fallacious. A given word may have a unique capacity to capsule an idea, evoke an emotion, or conjure up an image. Indeed; for those of us who place an appropriately high value on our cherished First Amendment rights, the word "censor" is such a word. Mr. Justice Harlan, speaking for the Court, recognized the truism that a speaker's choice of words cannot surgically be separated from the ideas he desires to express when he warned that "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Cohen* v. *California,* 403 U. S., at 26. Moreover, even if an alternative phrasing may communicate a speaker's abstract ideas as effectively as those words he is forbidden to use, it is doubtful that the sterilized message will convey the emotion that is an essential part of so many communications. This, too, was apparent to Mr. Justice Harlan and the Court in *Cohen.*

> "[W]e cannot overlook the fact, because it is well illustrated by the episode involved here, that much linguistic expression serves a dual communicative function: it con-

veys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated." *Id.,* at 25–26.

My Brother STEVENS also finds relevant to his First Amendment analysis the fact that "[a]dults who feel the need may purchase tapes and records or go to theaters and nightclubs to hear [the tabooed] words." *Ante,* at 750 n. 28. My Brother POWELL agrees: "The Commission's holding does not prevent willing adults from purchasing Carlin's record, from attending his performances, or, indeed, from reading the transcript reprinted as an appendix to the Court's opinion." *Ante,* at 760. The opinions of my Brethren display both a sad insensitivity to the fact that these alternatives involve the expenditure of money, time, and effort that many of those wishing to hear Mr. Carlin's message may not be able to afford, and a naive innocence of the reality that in many cases, the medium may well be the message.

The Court apparently believes that the FCC's actions here can be analogized to the zoning ordinances upheld in *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976). For two reasons, it is wrong. First, the zoning ordinances found to pass constitutional muster in *Young* had valid goals other than the channeling of protected speech. *Id.,* at 71 n. 34 (opinion of STEVENS, J.); *id.,* at 80 (POWELL, J., concurring). No such goals are present here. Second, and crucial to the opinions of my Brothers POWELL and STEVENS in *Young*—opinions, which, as they do in this case, supply the bare five-person majority of the Court—the ordinances did not restrict the access of distributors or exhibitors to the market or impair

the viewing public's access to the regulated material. *Id.,* at 62, 71 n. 35 (opinion of STEVENS, J.); *id.,* at 77 (POWELL, J., concurring). Again, this is not the situation here. Both those desiring to receive Carlin's message over the radio and those wishing to send it to them are prevented from doing so by the Commission's actions. Although, as my Brethren point out, Carlin's message may be disseminated or received by other means, this is of little consolation to those broadcasters and listeners who, for a host of reasons, not least among them financial, do not have access to, or cannot take advantage of, these other means.

Moreover, it is doubtful that even those frustrated listeners in a position to follow my Brother POWELL's gratuitous advice and attend one of Carlin's performances or purchase one of his records would receive precisely the same message Pacifica's radio station sent its audience. The airways are capable not only of carrying a message, but also of transforming it. A satirist's monologue may be most potent when delivered to a live audience; yet the choice whether this will in fact be the manner in which the message is delivered and received is one the First Amendment prohibits the government from making.

### III

It is quite evident that I find the Court's attempt to unstitch the warp and woof of First Amendment law in an effort to reshape its fabric to cover the patently wrong result the Court reaches in this case dangerous as well as lamentable. Yet there runs throughout the opinions of my Brothers POWELL and STEVENS another vein I find equally disturbing: a depressing inability to appreciate that in our land of cultural pluralism, there are many who think, act, and talk differently from the Members of this Court, and who do not share their fragile sensibilities. It is only an acute ethnocentric myopia that enables the Court to approve the censorship of communications solely because of the words they contain.

"A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne* v. *Eisner*, 245 U. S. 418, 425 (1918) (Holmes, J.). The words that the Court and the Commission find so unpalatable may be the stuff of everyday conversations in some, if not many, of the innumerable subcultures that compose this Nation. Academic research indicates that this is indeed the case. See B. Jackson, "Get Your Ass in the Water and Swim Like Me" (1974); J. Dillard, Black English (1972); W. Labov, Language in the Inner City: Studies in the Black English Vernacular (1972). As one researcher concluded, "[w]ords generally considered obscene like 'bullshit' and 'fuck' are considered neither obscene nor derogatory in the [black] vernacular except in particular contextual situations and when used with certain intonations." C. Bins, "Toward an Ethnography of Contemporary African American Oral Poetry," Language and Linguistics Working Papers No. 5, p. 82 (Georgetown Univ. Press 1972). Cf. *Keefe* v. *Geanakos*, 418 F. 2d 359, 361 (CA1 1969) (finding the use of the word "motherfucker" commonplace among young radicals and protesters).

Today's decision will thus have its greatest impact on broadcasters desiring to reach, and listening audiences composed of, persons who do not share the Court's view as to which words or expressions are acceptable and who, for a variety of reasons, including a conscious desire to flout majoritarian conventions, express themselves using words that may be regarded as offensive by those from different socio-economic backgrounds.[8]

---

[8] Under the approach taken by my Brother POWELL, the availability of broadcasts *about* groups whose members constitute such audiences might also be affected. Both news broadcasts about activities involving these groups and public affairs broadcasts about their concerns are apt to contain interviews, statements, or remarks by group leaders and members which may contain offensive language to an extent my Brother POWELL finds unacceptable.

In this context, the Court's decision may be seen for what, in the broader perspective, it really is: another of the dominant culture's inevitable efforts to force those groups who do not share its mores to conform to its way of thinking, acting, and speaking. See *Moore* v. *East Cleveland*, 431 U. S. 494, 506–511 (1977) (BRENNAN, J., concurring).

Pacifica, in response to an FCC inquiry about its broadcast of Carlin's satire on " 'the words you couldn't say on the public . . . airways,' " explained that "Carlin is not mouthing obscenities, he is merely using words to satirize as harmless and essentially silly our attitudes towards those words." 56 F. C. C. 2d, at 95, 96. In confirming Carlin's prescience as a social commentator by the result it reaches today, the Court evinces an attitude toward the "seven dirty words" that many others besides Mr. Carlin and Pacifica might describe as "silly." Whether today's decision will similarly prove "harmless" remains to be seen. One can only hope that it will.

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, dissenting.

The Court today recognizes the wise admonition that we should "avoid the unnecessary decision of [constitutional] issues." *Ante,* at 734. But it disregards one important application of this salutary principle—the need to construe an Act of Congress so as to avoid, if possible, passing upon its constitutionality.[1] It is apparent that the constitutional questions raised by the order of the Commission in this case are substantial.[2] Before deciding them, we should be certain that it is necessary to do so.

---

[1] See, *e. g., Johnson* v. *Robison,* 415 U. S. 361, 366–367; *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369; *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 569; *Ashwander* v. *TVA,* 297 U. S. 288, 348 (Brandeis, J., concurring); *Crowell* v. *Benson,* 285 U. S. 22, 62.

[2] The practice of construing a statute to avoid a constitutional confrontation is followed whenever there is " 'a serious doubt' " as to the statute's

The statute pursuant to which the Commission acted, 18 U. S. C. § 1464 (1976 ed.),[3] makes it a federal offense to utter "any obscene, indecent, or profane language by means of radio communication." The Commission held, and the Court today agrees, that "indecent" is a broader concept than "obscene" as the latter term was defined in *Miller* v. *California,* 413 U. S. 15, because language can be "indecent" although it has social, political, or artistic value and lacks prurient appeal. 56 F. C. C. 2d 94, 97–98.[4] But this construction of § 1464, while perhaps plausible, is by no means compelled. To the contrary, I think that "indecent" should properly be read as meaning no more than "obscene." Since the Carlin monologue concededly was not "obscene," I believe that the Commission lacked statutory authority to ban it. Under this construction of the statute, it is unnecessary to address the difficult and important issue of the Commission's constitutional power to prohibit speech that

constitutionality. *E. g., United States* v. *Rumely,* 345 U. S. 41, 45; *Blodgett* v. *Holden,* 275 U. S. 142, 148 (opinion of Holmes, J.). Thus, the Court has construed a statute to avoid raising a doubt as to its constitutionality even though the Court later in effect held that the statute, otherwise construed, would have been constitutionally valid. Compare *General Motors Corp.* v. *District of Columbia,* 380 U. S. 553, with *Moorman Mfg. Co.* v. *Bair,* 437 U. S. 267.

[3] The Court properly gives no weight to the Commission's passing reference in its order to 47 U. S. C. § 303 (g). *Ante,* at 739 n. 13. For one thing, the order clearly rests only upon the Commission's interpretation of the term "indecent" in § 1464; the attempt by the Commission in this Court to assert that § 303 (g) was an independent basis for its action must fail. Cf. *SEC* v. *Chenery Corp.,* 318 U. S. 80, 94–95; *SEC* v. *Sloan,* 436 U. S. 103, 117–118. Moreover, the general language of § 303 (g) cannot be used to circumvent the terms of a specific statutory mandate such as that of § 1464. "[T]he Commission's power in this respect is limited by the scope of the statute. Unless the [language] involved here [is] illegal under § [1464], the Commission cannot employ the statute to make [it] so by agency action." *FCC* v. *American Broadcasting Co.,* 347 U. S. 284, 290.

[4] The Commission did not rely on § 1464's prohibition of "profane" language, and it is thus unnecessary to ·consider the scope of that term.

would be constitutionally protected outside the context of electronic broadcasting.

This Court has recently decided the meaning of the term "indecent" in a closely related statutory context. In *Hamling* v. *United States,* 418 U. S. 87, the petitioner was convicted of violating 18 U. S. C. § 1461, which prohibits the mailing of "[e]very obscene, lewd, lascivious, indecent, filthy or vile article." The Court "construe[d] the generic terms in [§ 1461] to be limited to the sort of 'patently offensive representations or descriptions of that specific "hard core" sexual conduct given as examples in *Miller* v. *California.'* " 418 U. S., at 114, quoting *United States* v. *12 200-ft. Reels of Film,* 413 U. S. 123, 130 n. 7. Thus, the clear holding of *Hamling* is that "indecent" as used in § 1461 has the same meaning as "obscene" as that term was defined in the *Miller* case. See also *Marks* v. *United States,* 430 U. S. 188, 190 (18 U. S. C. § 1465).

Nothing requires the conclusion that the word "indecent" has any meaning in § 1464 other than that ascribed to the same word in § 1461.[5] Indeed, although the legislative history is largely silent,[6] such indications as there are support the view that §§ 1461 and 1464 should be construed similarly. The view that "indecent" means no more than "obscene" in § 1461 and similar statutes long antedated *Hamling.* See *United States* v. *Bennett,* 24 F. Cas. 1093 (No. 14,571) (CC SDNY 1879); *Dunlop* v. *United States,* 165 U. S. 486, 500–501;

---

[5] The only Federal Court of Appeals (apart from this case) to consider the question has held that " 'obscene' and 'indecent' in § 1464 are to be read as parts of a single proscription, applicable only if the challenged language appeals to the prurient interest." *United States* v. *Simpson,* 561 F. 2d 53, 60 (CA7).

[6] Section 1464 originated as part of § 29 of the Radio Act of 1927, 44 Stat. 1172, which was re-enacted as § 326 of the Communications Act of 1934, 48 Stat. 1091. Neither the committee reports nor the floor debates contain any discussion of the meaning of "obscene, indecent or profane language."

*Manual Enterprises* v. *Day,* 370 U. S. 478, 482–484, 487 (opinion of Harlan, J.).[7] And although §§ 1461 and 1464 were originally enacted separately, they were codified together in the Criminal Code of 1948 as part of a chapter entitled "Obscenity." There is nothing in the legislative history to suggest that Congress intended that the same word in two closely related sections should have different meanings. See H. R. Rep. No. 304, 80th Cong., 1st Sess., A104–A106 (1947).

I would hold, therefore, that Congress intended, by using the word "indecent" in § 1464, to prohibit nothing more than obscene speech.[8] Under that reading of the statute, the Commission's order in this case was not authorized, and on that basis I would affirm the judgment of the Court of Appeals.

---

[7] When the Federal Communications Act was amended in 1968 to prohibit "obscene, lewd, lascivious, filthy, or indecent" telephone calls, 82 Stat. 112, 47 U. S. C. § 223, the FCC itself indicated that it thought this language covered only "obscene" telephone calls. See H. R. Rep. No. 1109, 90th Cong., 2d Sess., 7–8 (1968).

[8] This construction is further supported by the general rule of lenity in construing criminal statutes. See *Adamo Wrecking Co.* v. *United States,* 434 U. S. 275, 285. The Court's statement that it need not consider the meaning § 1464 would have in a criminal prosecution, *ante,* at 739 n. 13, is contrary to settled precedent:

"It is true . . . that these are not criminal cases, but it is a criminal statute that we must interpret. There cannot be one construction for the Federal Communications Commission and another for the Department of Justice. If we should give § [1464] the broad construction urged by the Commission, the same construction would likewise apply in criminal cases." *FCC* v. *American Broadcasting Co., supra,* at 296.