**INTERNATIONAL OLYMPIC COMMITTEE, a corporation organized and existing under the laws of Switzerland; United States Olympic Committee, a corporation organized and existing under the laws of the United States of America, Plaintiffs-Cross-Defendants-Appellees,**

v.

**SAN FRANCISCO ARTS & ATHLETICS, a California corporation, and Thomas P. Waddell, Defendants-Cross-Plaintiffs-Appellants.**

Nos. 84–1759, 84–2528.

United States Court of Appeals, Ninth Circuit.

Jan. 27, 1986.

As Amended May 22, 1986.

Dissenting Opinion May 28, 1986.

Before GOODWIN and WALLACE, Circuit Judges, and STEPHENS, District Judge.*

---

* The Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

Upon petition for rehearing and suggestion for rehearing en banc, the panel has voted to amend its opinion entered herein January 27, 1986, 781 F.2d 733 (9th Cir. 1986), as follows:

On page 737, column 1, line 11 from the bottom, insert footnote marker 1/ and the following text:

SFAA contends that our finding of no state action conflicts with *Martin v. International Olympic Committee,* 740 F.2d 670, 677 (9th Cir.1984). We disagree. The determination whether state action exists is entirely dependent on the unique facts of each case. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 726 [81 S.Ct. 856, 862, 6 L.Ed.2d 45] (1961). In *Martin,* the government involvement was significantly more extensive than that found in this case.

On page 738, column 1, renumber the footnote to 2/.

The full court was advised of the suggestion for rehearing en banc. An active judge called for a vote on whether to rehear the matter en banc. The request for en banc consideration failed to receive a favorable majority of the votes of the active judges.

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

KOZINSKI, Circuit Judge, with whom PREGERSON and NORRIS, Circuit Judges join, dissenting.

This case was brought by the United States Olympic Committee (USOC) and others under the Amateur Sports Act of 1978 (the Amateur Act), 36 U.S.C. §§ 371–396 (1982), to enjoin the use of the word "Olympic" by appellants, San Francisco Arts & Athletics (SFAA) in connection with an event to be known as the Gay Olympic Games. USOC is a private nonprofit corporation chartered by Congress, 36 U.S.C. §§ 371, 377 (1982); SFAA is a non-profit corporation. The Gay Olympic Games SFAA intended to sponsor in 1982 (and again in 1986), were "designed to combat homophobia and to work for the health and tolerance of gay and lesbian persons." Pet. Reh. 2.

A panel of this court upheld a permanent injunction issued after summary judgment had been granted to USOC. *International Olympic Committee v. San Francisco Arts & Athletics,* 781 F.2d 733 (9th Cir. 1986). For the reasons stated below, I find the panel's reasoning squarely at odds with controlling Supreme Court authority. Moreover, the result reached threatens a potentially serious and widespread infringement of personal liberties. I therefore would vacate the panel's opinion and set the case for rehearing en banc.

## I.

A. As the panel interprets the Amateur Act, the USOC is given the exclusive right to use the word Olympic "for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition," 36 U.S.C. § 380, whether undertaken for profit or for a non-profit purpose. The USOC may obtain an injunction against use of this term without showing likelihood of confusion and without overcoming the defenses normally available in trademark infringement actions under the Lanham Act. 781 F.2d at 736.

Interpreted in this fashion, the Amateur Act represents a sweeping exercise of sovereign power, implicating principles of individual liberty protected by our Constitution. By passing the Act, Congress extracted a word from the English language and gave it to a private party to use in connection with any commercial endeavor or public event. This raises serious first amendment concerns that the panel failed to address or acknowledge.

The word Olympic has a meaning unique within our language. It connotes open and intense competition among non-professional athletes, usually involving the best and most accomplished contestants. Thus, we have Special Olympics, Junior Olympics, Police Olympics, and Canine Olympics, normally involving competition among the best and finest within the denoted category. I have great difficulty with the idea that Congress can deny all of us that word, and the ideas it embodies, in connection with all public endeavors. As noted by Justice Harlan in *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed. 284 (1971), "we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." The ideas embodied in the word Olympic can, of course, be expressed by other means, but only in a much clumsier fashion, without the same nuance of meaning. As Justice Harlan wrote in *Cohen*,

> much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. We cannot sanction the view that the Constitution, while solicitous of the cognitive content of individual speech, has little or no regard for that emotive function which, practically speaking, may often be the more important element of the overall message sought to be communicated.

*Id.* at 26, 91 S.Ct. at 1788.

In organizing the Gay Olympic Games, the SFAA sought to " 'creat[e] a more realistic image of homosexual men and women in all societies' and to 'provid[e] more alternatives for homosexual men and women to move into the mainstreams of their respective societies.' " *International Olympic Committee v. San Francisco Arts & Athletics*, 219 U.S.P.Q. 982, 985 (N.D.Cal.1982), *aff'd mem.*, 707 F.2d 517 (9th Cir.1983). The word Olympic was no doubt chosen to foster a wholesome, normal image of homosexuals. Denying SFAA use of the word

thwarts that purpose. To say that the SFAA could have named its event "The Best and Most Accomplished Amateur Gay Athletes Competition" no more answers the first amendment concerns here than to suggest that Paul Robert Cohen could have worn a jacket saying "I Strongly Resent the Draft."

The Supreme Court has been extremely reluctant to approve restrictions against the use of particular words. *See Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *Linmark Associates, Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (striking down a prohibition against posting "For Sale" and "Sold" signs on residential lawns). In the rare case when the Court has done so, it was only after the closest scrutiny and subject to the most careful restrictions. *See, e.g., FCC v. Pacifica Foundation*, 438 U.S. 726, 744–51, 98 S.Ct. 3026, 3037–41, 57 L.Ed.2d 1073 (1978) (FCC ban of patently offensive language justified because of special concerns pertaining to broadcasting). By contrast, the panel here dismisses SFAA's constitutional argument, simply noting that "the word 'Olympic' and its associated symbols and slogans are essentially property. Such property rights can be protected without violating the First Amendment." 781 F.2d at 737 (citing *Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 573–77, 97 S.Ct. 2849, 2856–58, 53 L.Ed.2d 965 (1977); *Hudgens v. NLRB*, 424 U.S. 507, 518–21, 96 S.Ct. 1029, 1035–37, 47 L.Ed.2d 196 (1976)).

To say that the word Olympic is property begs the question. What appellants challenge is the power of Congress to privatize the word Olympic, rendering it unutterable by anyone else in connection with any product or public event, whether for profit or, as in this case, to promote a cause.

The rights conferred on the USOC by the Amateur Act are materially different from traditional intellectual property rights where a careful balance is struck between the interests of the property owner and

those of the public. Trademarks,[1] copyrights[2] and patents[3] are subject to a variety of statutory and common law defenses, and they reserve only those rights necessary to protect the owner's economic interests. *Zacchini,* upon which the panel relied, is instructive. The Court there was careful to limit the relief afforded petitioner (the human cannonball) to assuring that he "reap[s] the reward of his endeavors." 433 U.S. at 573, 97 S.Ct. at 2856. The Court twice noted that "[p]etitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it." *Id.* at 578, 97 S.Ct. at 2859; *see id.* at 573–74, 97 S.Ct. at 2856.

By and large, rights in intellectual property are limited to uses that have been invented, created or developed by the owner. They are not a wholesale prohibition against all public uses but provide limited protection for that which "is the product of [the owner's] own talents and energy, the end result of much time, effort, and ex-

pense." *Zacchini,* 433 U.S. at 575, 97 S.Ct. at 2857. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* — U.S. —, 105 S.Ct. 2218, 2223, 85 L.Ed.2d 588 (1985). So limited, rights in intellectual property are easily harmonized with the first amendment. *See id.* at 2228–31; *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir. 1977) (copyright); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir.1979) (trademark); J. Gilson, *Trademark Protection and Practice,* § 5.09[5] (1985); Nimmer, *Does Copyright Abridge the First Amendment Guarantees of Free Speech and Press?,* 17 UCLA L.Rev. 1180 (1970).

However, when cut loose from their conceptual moorings, intellectual property rights can raise serious constitutional concerns. Here, the Act's ironclad prohibition against every commercial or threatrical use of the word Olympic (unrestrained by the

---

1. Trademarks are recognized only upon a showing that the mark has been adopted and used in commerce. 15 U.S.C. § 1051 (1982); *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1265 (5th Cir.1975). Subsequent users may raise a series of defenses under section 33(b) of the Lanham Act, such as fraud on the Patent and Trademark Office, abandonment, fair use, misrepresentation of source, or violation of the antitrust laws. 15 U.S.C. § 1115 (1982). There are also equitable defenses such as estoppel by laches, *Anheuser-Busch, Inc. v. Du Bois Brewing Co.,* 175 F.2d 370, 374 (3rd Cir.1949), *cert. denied,* 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1353 (1950); estoppel by acquiescence, *see National Football League v. Governor of Delaware,* 435 F.Supp. 1372 (D.Del.1977); and unclean hands, *see Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Most importantly, trademark rights can only exist in distinctive terms and devices. 15 U.S.C. § 1052 (1982); *see Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352 (9th Cir.1985) (en banc). Similarly, there cannot be a trademark in a purely functional device. *Fotomat Corp. v. Photo Drive-Thru, Inc.,* 425 F.Supp. 693 (D.N.J.1977); *see Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 119–20, 59 S.Ct. 109, 113–14, 83 L.Ed. 73 (1938). Distinctiveness is central to the status of a mark. A legitimate trademark will lose its status if it becomes generic. *Bayer Co. v. United Drug Co.,* 272 F. 505 (S.D.N.Y.1921) (declaring the term 'aspirin,' originally a trademark, to be the common name of a nonprescription drug). Thus, trademark owners have an exclusive right to use the mark only to the extent necessary to safeguard the integrity of the product source. J. Gilson, *Trademark Protection and Practice* § 1.03[5] (1985).

2. Copyrights are of limited duration, U.S. Const., Art. 1, § 8; 17 U.S.C. § 302 (1982), and are subject to a number of defenses, most notably the defense of fair use. 17 U.S.C. §§ 107–117 (1982). Copyright protection will not extend to the idea itself, *Baker v. Selden,* 101 U.S. 99, 11 Otto 99, 25 L.Ed. 841 (1880) (no copyright in accounting system); or to purely utilitarian objects, *Mazer v. Stein,* 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) (allowing copyright of figurative lamp base, although lamp itself was functional).

3. Patents are granted only for subject matter that is novel, useful and nonobvious. 35 U.S.C. §§ 101–103 (1982). They are limited in time. U.S. Const. Art. I, § 8; 35 U.S.C. § 154 (1982). They are also subject to a variety of legal and equitable defenses, including patent misuse, *Sonobond Corp. v. Uthe Technology, Inc.,* 314 F.Supp. 878 (N.D.Cal.1970); invalidity, *Lang v. VSL Corp.,* 219 U.S.P.Q. 625, 627 (E.D.Va.1982); expiration of the statute of limitations, 35 U.S.C. § 286 (1982); laches and estoppel, *Potter Instrument Co. v. Storage Technology Corp.,* 641 F.2d 190, 191 (4th Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981); and inequitable conduct before the Patent and Trademark Office, *J.P. Stevens Co. v. Lex Tex, Ltd.,* 747 F.2d 1553 (Fed.Cir.1984), *cert. denied,* — U.S. —, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

need to show likelihood of confusion or to overcome Lanham Act defenses) stakes out an intellectual property fiefdom quite unlike anything we have seen in our law before.[4] By giving the USOC exclusive possession of the word, Congress has diminshed the rights of everyone else, withdrawing from the public domain a term used by many and useful to more. If Congress has the power to grant a crown monopoly in the word Olympic, one wonders how many other words or concepts can be similarly enclosed, and the extent to which our public discourse can thereby be impoverished. *See Cohen v. California*, 403 U.S. at 26, 91 S.Ct. at 1788.

**B.** My first amendment concerns are heightened by the way the USOC allegedly exercises its stewardship over the word Olympic. According to the petition for rehearing "[t]he facts submitted below establish that USOC has openly permitted use of 'Olympic' both by groups that it directly supports, e.g. the Special Olympics, the Explorer Olympics and the Junior Olympics, and by groups that it has known to be using 'Olympic' and that it has elected not to sue, such as the 'International Police Olympics.'" Pet. Reh. 10.

Accepting SFAA's allegation, as we must, it seems that the USOC is using its control over the term Olympic to promote the very image of homosexuals that the SFAA seeks to combat: handicapped, juniors, police, Explorers, even dogs are allowed to carry the Olympic torch, but homosexuals are not. Troublesome as would be a total withdrawal of the term from public discourse, an exclusion that is invoked pursuant to a subjective assessment of the wholesomeness of the proposed speaker or propriety of the proposed message is more troublesome still. *See Police Department of Chicago v. Mosley*, 408 U.S. 92, 99–102, 92 S.Ct. 2286, 2292–93, 33 L.Ed.2d 212 (1972); *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1198, 92 L.Ed. 1574 (1948). Where the entity making the decision is private, unconstrained by principles of equal protection and due process, and entirely free of the discipline imposed by our political system, there are no safeguards whatsoever against arbitrary exclusion of certain groups because they with the communicate ideas some may find offensive.[5] Under the panel's rationale, the result would have been the same if appellants were blacks rather than homosexuals, and their claims were based on racism rather than homophobia.

## II.

**A.** Once it is concluded that the first amendment is implicated by giving USOC the word Olympic, the next inquiry must be whether doing so directly advances a sub-

---

4. An examination of business listings in metropolitan telephone directories gives some indication of the Amateur Act's sweep. In Los Angeles there are listings for over 140 businesses whose name starts with the word Olympic, many of them located on Olympic Boulevard. Pacific Bell, *White Pages: Los Angeles* 773–74 (1985). The Manhattan directory has about 60 listings. New York Telephone, *NYNEX White Pages: Manhattan* 1142 (1985). The directory for Olympia, Washington, has over 30 listings. Pacific Northwest Bell, *White & Yellow Pages: Olympia, Lacey & Tumwater* 111 (1985). Among the listings are such diverse businesses as the Olympic Bar B Que Restaurant; Olympic Donuts; the Olympic Married Matching Service; the Olympic Tae Kwon-Do Karate Studio; Olympic Trailer Movers; the Olympic Memorial Funeral Home; Olympic Unpainted Furniture; Olympic Wall Street Services; and the Olympic Headwear Novelty Company. These trade names, and what must be hundreds more across the country, presumably violate the Amateur Act as interpreted by the court.

5. As the Court held in *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975), "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use. Our distaste for censorship—reflecting the natural distaste of a free people—is deep-written in our law." *Accord Preferred Communications, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1409 (9th Cir.) (first amendment violation found because of "impermissible risk of covert discrimination based on the content of or the views expressed in the operator's proposed programming"), *cert. granted,* —— U.S. ——, 106 S.Ct. 380, 88 L.Ed.2d 333 (1985).

stantial governmental interest. *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 564, 566, 100 S.Ct. 2343, 2350, 2351, 65 L.Ed.2d 341 (1980). If the Amateur Act prohibited only those uses likely to cause confusion or otherwise mislead the public, it would in all likelihood survive first amendment challenge. *See Friedman v. Rogers,* 440 U.S. 1, 13–15, 99 S.Ct. 887, 895–96, 59 L.Ed.2d 100 (1979). However, the panel reads the Act as proscribing *all* unauthorized uses of the word Olympic, regardless of whether they would mislead the public, undermine USOC sponsored events or cause anyone any harm whatsoever. The first amendment requires, at minimum, close scrutiny of the governmental interest served by such a broad prohibition.

Because the case was dismissed short of trial, we can only speculate as to what governmental interest is advanced by giving USOC such sweeping rights in the word Olympic. As the panel noted, however, "[o]ther courts have remarked on the need to insure the market value of licenses for the use of Olympic symbols." 781 F.2d at 736 (citing *Stop the Olympic Prison v. United States Olympic Committee,* 489 F.Supp. 1112, 1120 (S.D.N.Y.1980)). *See also International Olympic Committee v. San Francisco Arts & Athletics,* 219 U.S. P.Q. 982, 985 (N.D.Cal.1982), *aff'd mem.,* 707 F.2d 517 (9th Cir.1983); *United States Olympic Committee v. International Federation of Bodybuilders,* 219 U.S.P.Q. 353, 356 (D.D.C.1982). Apparently the Amateur Act serves as a type of subsidy to the USOC in lieu of direct financial support:

> The fundamental purpose of [the Amateur] Act was to safeguard the USOC's ability to raise the financial resources that are a critical component of America's capacity to send world-class amateur athletes into international competition without the massive government subsidies enjoyed by competitors from other nations.

*United States Olympic Committee v. Intelicense Corp.,* 737 F.2d at 264 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984).

If this is the only interest supporting the USOC's monopoly, I seriously doubt whether it would justify even a minor restriction on free speech. In words that seem to address this very issue, Justice Marshall noted earlier this Term:

> While the interference with appellant's speech is, concededly, very slight, the State's justification—the subsidization of another speaker chosen by the State—is insufficient to sustain even that minor burden. We have held that the State may use its own resources for subsidization, *Regan v. Taxation with Representation of Washington,* 461 U.S. 540 [103 S.Ct. 1997, 76 L.Ed.2d 129] (1983), but that interest, standing alone, cannot justify interference with the speech of others. *See Buckley v. Valeo,* 424 U.S. 1, 48–49 [96 S.Ct. 612, 648–49, 46 L.Ed.2d 659] (1976) (per curiam); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 790–92 [98 S.Ct. 1407, 1423–24, 55 L.Ed.2d 707] (1978).

*Pacific Gas & Electric Co. v. Public Utilities Commission,* —— U.S. ——, 106 S.Ct. 903, 916, 89 L.Ed.2d 1 (1986) (footnote omitted) (Marshall, J., concurring).

**B.** Even if the government's interest in subsidizing the USOC were deemed sufficient to abridge some of appellants' first amendment rights, we would still have to determine whether the broad monopoly granted by the Amateur Act "is not more extensive than is necessary to serve that interest." *Central Hudson Gas,* 447 U.S. at 566, 100 S.Ct. at 2351. Again, the scant record here makes that determination difficult, but the question is amenable to no simple answer. At the very least, it is necessary to consider whether USOC's commercial licenses could not be adequately protected by giving the USOC rights coextensive with those in the Lanham Act or by restricting its control over the use of the word Olympic in some other fashion. Or so, at least, do I read the Supreme Court's uniform pronouncements in this area. *See, e.g., Police Department of Chicago v. Mosley,* 408 U.S. 92, 101 n. 8, 92

S.Ct. 2286, 2293 n. 8, 33 L.Ed.2d 212 (1972) & authorities cited therein; *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–83, 84 S.Ct. 710, 725–27, 11 L.Ed.2d 686 (1963).

### III.

While I hesitate to second-guess the panel's interpretation of the Amateur Act, I respectfully suggest that its conclusion that the USOC need not prove confusion or overcome Lanham Act defenses is not inevitable. If, as I suggest, the interpretation the panel adopts raises serious constitutional concerns, it may be appropriate to resort to a narrowing construction of the statute. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 134–36, 95 S.Ct. 335, 353–55, 42 L.Ed.2d 320 (1974); *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973). Because the panel failed to address what I see as the clear first amendment implications of its decision, it did not consider the possibility of giving the Amateur Act a less sweeping interpretation.

### IV.

By raising these concerns I do not necessarily conclude that the Amateur Act is irreconcilably at odds with the first amendment. Indeed, on this barren record I find it difficult to reach any but the most tentative conclusions about this highly unusual statute and its effect upon our personal liberties. What I find most troubling, however, is the haste with which appellants are being ushered out of court. The panel appears to have overlooked that where first amendment defenses are raised "[j]udgment as to whether the facts justify the use of the drastic power of injunction necessarily turns on subtle and controversial considerations and upon a delicate assessment of the particular situation in light of

legal standards which are inescapably imprecise." *Carroll v. Princess Anne,* 393 U.S. 175, 183, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968).

What appellants propose to do, after all, lies at the very heart of the first amendment: they wish to hold a public event to promote socio-political views some may find offensive. They claim that calling their event the Gay Olympic Games is essential to the message they wish to convey. A long and unbroken line of Supreme Court cases stands for the proposition that "[a]ny prior restraint on expression comes to [court] with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. O'Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971) (citing *Carroll,* 393 U.S. at 181, 89 S.Ct. at 351; *Bantam Books v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)).[6] Under this standard, prior restraints have been struck down even where adopted to protect important public or private interests. *See, e.g., New York Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (national security); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (privacy). By contrast, the panel here approves a permanent injunction that significantly blunts rights to public expression without the slightest showing that the enjoined use would harm anyone.

Moreover, "[a]n order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll,* 393 U.S. at 183, 89 S.Ct. at 353. I have much difficulty reconciling the blunderbuss injunction entered against SFAA with this admonition. With all due respect, the panel's offhand approval of this injunction, obtained as it was by summary judgment, simply does not measure up to the close appellate scrutiny due first amend-

---

**6.** Courts have been particularly vigilant in guarding the first amendment rights of groups espousing unpopular points of view. *See, e.g., Carroll v. Princess Anne,* 393 U.S. 175, 89 S.Ct.

347, 21 L.Ed.2d 325 (1968) ("white supremacist" National States Rights Party); *Collin v. Smith,* 578 F.2d 1197 (7th Cir.), *cert. denied,* 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed.2d 264 (1978) (Nazis).

ment claims and defenses. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 1961–65, 80 L.Ed.2d 502 (1984); *Standard Oil Co. of California v. FTC,* 577 F.2d 653 (9th Cir. 1978).

\*     \*     \*

In sum, I believe that the petition for rehearing raises very serious arguments that deserve consideration and resolution by the court en banc. The panel fails to acknowledge the difficult first amendment issues presented, regrettably bypassing what I consider to be clear and applicable guidance from the Supreme Court. The opinion will therefore prove a troublesome precedent, undermining not only the right to free speech, but also the laws protecting intellectual property, to the ultimate detriment of both.

While not every error by a panel can be addressed by the full court, the important and novel constitutional issues raised by this case, the panel's failure to adequately address them and the likely adverse effect the opinion will have on personal liberties, all strongly militate in favor of rehearing the case en banc. I therefore respectfully dissent from the court's refusal to do so.