LEVAL, Circuit Judge,
dissenting.
I respectfully dissent from my colleagues’ ruling because I believe the Federal Communications Commission (“FCC” or “Commission”) gave a reasoned explanation for its change of standard and thus complied with the requirement of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A).
A television broadcaster, Fox Television Stations, Inc., challenges the lawfulness of a small change made by the FCC in its standards for adjudicating com *468 plaints of indecency over the airwaves. The Commission exercises the responsibility of determining, upon receipt of public complaints, whether a licensed broadcaster has violated 18 U.S.C. § 1464 by disseminating indecent material over the airwaves. Beginning with its adjudication of complaints arising from the broadcast of the Golden Globe Awards in 2002, the Commission instituted a change in its manner of dealing with “fleeting,” i.e. unrepeated, expletives. During this broadcast, rock-musician Bono expressed delight over his receipt of an award by saying, “[Tjhis is really, really, fucking brilliant.” In a lengthy tradition of previous FCC rulings, absence of repetition of an expletive had been virtually conclusive against finding an indecency violation. The staff therefore recommended in Bono’s case, largely because the expletive was unrepeated, that no violation be found. See Complaints Against Various Broadcast Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 18 F.C.C.R. 19859, at ¶ 6 (Enforcement Bureau 2003). The Commission reversed the recommendation of its staff. Adopting a new altered standard, which diminished the significance of the fact that the potentially offensive expletive was not repeated, the Commission concluded that the broadcast of Bono’s expletive constituted indecency in violation of § 1464. See Complaints Against Various Broadcast Licensees Regarding Their Airing of the “Golden Globe Awards” Program, 19 F.C.C.R. 4975, at ¶¶ 12, 17 (2004) (“Golden Globes ”).
The occurrences under review in this case followed soon after the Bono incident, during live broadcasts by Fox of Billboard Music Awards shows in 2002 and 2003. In the 2002 Billboard Music Awards, the actress and singer Cher, expressing triumphant delight upon her receipt of an award, said, “People have been telling me I’m on the way out every year, right? So fuck ‘em.” The incident during the 2003 Billboard Music Awards involved Nicole Richie and Paris Hilton, the co-stars of a serialized televised comedy show entitled, “The Simple Life,” as presenters of awards. In “The Simple Life,” Richie and Hilton play themselves as two spoiled, rich young women from Beverly Hills who cope with life on a farm. In joking reference to their own show, Richie said, “Why do they even call it ‘The Simple Life?’ Have you ever tried to get cow shit out of a Prada purse? It’s not so fucking simple.” The Commission received complaints about each incident. Referring to its newly changed policy developed in response to the Bono incident in Golden Globes, the Commission found that the two Billboard Music incidents were violations. See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 13299 (2006) (“Remand Order ”). Fox brought this action seeking to invalidate the Commission’s rulings.
In adjudicating indecency complaints the Commission generally employs a context-based evaluation to determine whether the particular utterance is “patently offensive as measured by contemporary community standards.” Industry Guidance on the Commission’s Case Law Interpreting 18 U.S.C. § im, 16 F.C.C.R. 7999, at ¶ 8 (2001) (“Industry Guidance ”) (emphasis in original). Factors weighing in favor of a finding of indecency are: “(1) the explicitness or graphic nature of the description or depiction of sexual or excretory organs or activities; (2) whether the material dwells on or repeats at length descriptions of sexual or excretory organs or activities; (3) whether the material appears to pander or is used to titillate, or whether the material appears to have been presented for its shock value.” Industry Guidance, *469 at ¶ 10 (emphasis in original). Especially in relation to the “pandering” factor, a finding of violation is less likely if the broadcast of the utterance involved a genuine news report, or if censorship of the expletive would harm or distort artistic integrity. Prior to the Bono incident, the Commission attached great importance to the second factor, which focuses on whether an expletive was repeated. Under the pre-Golden Globes rulings, the fact that an utterance was fleeting was virtually conclusive in assuring it would not be deemed a violation (unless it breached special barriers, such as by referring to sexual activities with children). With its Golden Globes adjudication, however, the Commission adopted a less permissive stance. It announced that henceforth fleeting expletives would be judged according to a standard more closely aligned with repeated utterances of expletives. Thus, the Commission has declared that it remains unlikely to find a violation in an expletive that is broadcast in the context of a genuine news report, or where censorship by bleeping out the expletive would compromise artistic integrity, but it will no longer give a nearly automatic pass merely because the expletive was not repeated. See Remand Order, at ¶ 28.
The Commission explained succinctly why lack of repetition of the F-Word would no longer result in a virtual free pass. “[W]e believe that, given the core-meaning of the ‘F-Word,’ any use of that word or a variation, in any context, inherently has a sexual connotation.... The ‘F-Word’ is one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language. Its use invariably invokes a coarse sexual image.” Golden Globes, at ¶¶ 8-9. “[A]ny use of that word has a sexual connotation even if the word is not used literally.” Remand Order, at ¶ 16.
My colleagues find that in so altering its standards the Commission has acted illegally. They rule that the Commission failed to give a reasoned analysis explaining the change of rule. They accordingly find that the change of standard was arbitrary and capricious and therefore violated the Administrative Procedure Act. I disagree. In explanation of this relatively modest change of standard, the Commission gave a sensible, although not necessarily compelling, reason. In relation to the word “fuck,” the Commission’s central explanation for the change was essentially its perception that the “F-Word” is not only of extreme and graphic vulgarity, but also conveys an inescapably sexual connotation. The Commission thus concluded that the use of the F-Word — even in a single fleeting instance without repetition — is likely to constitute an offense to the decency standards of § 1464.
The standards for judicial review of administrative actions are discussed in a few leading Supreme Court opinions from which the majority quotes. Agencies operate with broad discretionary power to establish rules and standards, and courts are required to give deference to agency decisions. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A court must not “substitute its judgment for that of the agency.” Motor Vehicle Mfrs. Ass’n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (“Administrative decisions should [not] be set aside ... because the court is unhappy with the result reached.”). In general, an agency’s determination will be upheld by a court unless found to be “arbitrary and capricious.” See 5 U.S.C. 706(2)(A).
*470 An agency is free furthermore to change its standards. See Chevron, 467 U.S. at 863, 104 S.Ct. 2778 (“An initial agency interpretation is not instantly carved in stone.”); Huntington Hosp. v. Thompson, 319 F.3d 74, 79 (2d Cir.2003) (“[A]n agency is not locked into the first interpretation of a statute it embraces.”); Ramaprakash, 346 F.3d at 1125 (“Agencies are free to change course as their expertise and experience may suggest or require”). The Supreme Court has made clear that when an agency changes its standard or rule, it is “obligated to supply a reasoned analysis for the change.” State Farm, 463 U.S. at 42, 103 S.Ct. 2856. If an agency without explanation were to make an adjudication which is not- consistent with the agency’s previously established standards, the troubling question would arise whether the agency has lawfully changed its standard, or whether it has arbitrarily failed to adhere to its standard, which it may not lawfully do.[15] Accordingly our court has ruled that “an agency ... cannot simply adopt inconsistent positions without presenting ‘some reasoned analysis.’ ” Huntington Hosp., 319 F.3d at 79. Such explanation, we have said, is necessary so that the reviewing court may “be able to understand the basis of the agency’s action so that it may judge the consistency of that action with the agency’s mandate.” Mr. Sprout, Inc. v. United States, 8 F.3d 118, 129 (2d Cir.1993). The District of Columbia Circuit has similarly reasoned that an agency’s “failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making.” Ramaprakash, 346 F.3d at 1125 (quotation marks omitted). In changing course, an agency must “provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.” Id. at 1124 (quotation marks omitted).
In my view, in changing its position on the repetition of an expletive, the Commission complied with these requirements. It made clear acknowledgment that its Golden Globes and Remand Order rulings were not consistent with its prior standard regarding lack of repetition. It announced the adoption of a new standard. And it furnished a reasoned explanation for the change. Although one can reasonably disagree with the Commission’s new position, its explanation — at least with respect to the F-Word — is not irrational, arbitrary, or capricious. The Commission thus satisfied the standards of the Administrative Procedures Act.
The Commission explained that the F-Word is “one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language [whose] use invariably invokes a coarse sexual image.” Golden Globes, at ¶ 9. In other words, the Commission found, contrary to its earlier policy, that the word is of such graphic explicitness in inevitable reference to sexual activity that absence of repetition does not save it from violating the standard of decency.
My colleagues offer several arguments in support of their conclusion that the Commission’s explanation was not reasonable and therefore arbitrary and capri *471 cious. They argue (i) the Commission’s position is irrational because of inconsistency resulting from the Commission’s willingness to allow viewers to be subjected to a “first blow” if it comes in the context of a genuine news broadcast; (ii) the Commission’s prediction that allowance of fleeting expletives will result in a great increase in their incidence is irrational because prior experience was to the contrary; and (in) the Commission is “divorced from reality” believing that the F-Word invariably invokes a sexual connotation. I respectfully disagree.
The majority argues that the Commission’s change of standard is irrational because it is inconsistent. The opinion goes on to explain:
[T]he Commission does not take the position that any occurrence of an expletive is indecent.... [T]he Commission will apparently excuse an expletive when it occurs during a “bona fide news interview” .... The Commission even conceded that a rebroadcast of precisely the same offending clips of the two Billboard Music Award programs for the purpose of providing background information on this case would not result in any action by the FCC.... [E]ven repeated and deliberate use of numerous expletives is not indecent ... if the expletives are “integral” to the work [as in the case of the film “Saving Private Ryan”].
Majority op. at pages 458-59. The majority is of course correct that the Commission does not follow an all-or-nothing policy. Its standards do attempt to draw context-based distinctions, with the result that no violation will be found in circumstances where usage is considered sufficiently justified that it does not constitute indecency.
This, however, is in no way a consequence of the Commission’s change of standard for fleeting expletives. It applies across the board to all circumstances. Regardless of whether the expletive was repeated or fleeting, the Commission will apply context-based standards to determine whether the incident constituted indecency. A bona fide news context and recognition of artistic integrity favor a finding of no violation. The majority’s criticism of inconsistency is not properly directed against the change of standard here in question, which has done nothing to increase the inconsistency. If anything, the change of standard has made the Commission more consistent rather than less, because under the new rule, the same context-based factors will apply to all circumstances. If there is merit in the majority’s argument that the Commission’s actions are arbitrary and capricious because of irrationality in its standards for determining when expletives are permitted and when forbidden, that argument must be directed against the entire censorship structure. It does not demonstrate that the Commission’s change of standard for the fleeting expletive was irrational.
Furthermore, while the Commission will indeed allow the broadcast of the same material in some circumstances but not in others, I do not see why this differentiation should be considered irrational. It rather seeks to reconcile conflicting values. On the one hand, it recognizes, as stressed by the Supreme Court in Pacifica, the potential for harm to children resulting from exposure to indecency. On the other hand, the Commission has historically recognized that categorical prohibition of the broadcast of all instances of usage of a word generally considered indecent would suppress material of value, which should not be deemed indecent upon consideration of the context. This is not irrationality.[16] *472 It is an attempt on the part of the Commission over the years to reconcile conflicting values through standards which take account of context.
The majority then argues that the Commission reasoned irrationally when in its Remand Order, as a part of its explanation for its change of position, the Commission observed:
[Gjranting an automatic exemption for “isolated or fleeting” expletives ... would as a matter of logic permit broadcasters to air expletives at all hours of a day so long as they did so one at a time. For example, broadcasters would be able to air ... offensive ... words, regardless of context, with impunity ... provided that they did not air more than one expletive in any program segment.
Remand Order, at ¶ 25. The majority asserts that this concern was “divorced from reality.” Majority op. at page 460. On the majority’s view, because broadcasters did not “barragef ] the airwaves with expletives” during the period prior to Golden Globes when fleeting expletives received a free pass, they would not do so in the future.
The agency has one prediction of what would likely occur in the future under the pre-Golden Globes policy. The majority has another. The majority may be right in speculating that the Commission’s concern is exaggerated. Who knows? As a matter of law, it makes no difference. The court is obligated to give deference to agency judgment and may not substitute its judgment for that of the agency, or set aside an agency action merely because the court believes the agency is wrong. See State Farm, 463 U.S. at 43, 103 S.Ct. 2856 (court must not “substitute its judgment for that of the agency”); Vermont Yankee, 435 U.S. at 558, 98 S.Ct. 1197 (“Administrative decisions should [not] be set aside ... because the court is unhappy with the result.”). Only if the agency’s action is “arbitrary and capricious” may the court nullify it. 5 U.S.C. § 706(2)(A).
Furthermore, if obligated to choose, I would bet my money on the agency’s prediction. The majority’s view presupposes that the future would repeat the past. It argues that because the networks were not flooded with discrete, fleeting expletives when fleeting expletives had a free pass, they would not be flooded in the future. This fails to take account of two facts. First, the words proscribed by the Commission’s decency standards are much more common in daily discourse today than they were thirty years ago. Second, the regulated networks compete for audience with the unregulated cable channels, which increasingly make liberal use of their freedom to fill programming with such expletives. The media press regularly reports how difficult it is for networks to compete with cable for that reason.[17] It *473 seems to me the agency has good reason to expect that a marked increase would occur if the old policy were continued.
In any event, even if the majority could reasonably label this aspect of the Commission’s reasoning “arbitrary and capricious,” it still would not matter. The agency’s action in changing the standard for fleeting expletives did not depend on the defensibility of this prediction. It is at most a small part of the agency’s justification for its action.
Finally the majority disagrees with the Commission’s view that the word “fuck” communicates an “inherently ... sexual connotation [and] invariably invokes a coarse sexual image.” Golden Globes, at ¶¶ 8-9. The majority notes that the F-Word is often used in everyday conversation without any sexual meaning. Majority op. at page 459. I agree with the majority that the word is often used without a necessary intention on the. part of the speaker to refer to sex. A student who gets a disappointing grade on a test, a cook who burns the roast, or a driver who returns to his parked car to find a parking ticket on the windshield, might holler out the F-Word to express anger or disappointment. The word is also sometimes used to express delight, as with Bono’s exhilarated utterance on his receipt of his award. Some use it more as a declaration of uncompromising toughness, or of alignment on the side of vulgarity against prissy manners, without necessarily intending to evoke any sexual meaning. Some use it to intensify whatever it is they may be saying, and some sprinkle the word indiscriminately throughout their conversation with no apparent meaning whatsoever.
The majority, however, misunderstands the Commission’s reasoning, or in any event interprets it in the manner least favorable to the Commission. In observing that fuck “invariably invokes a coarse sexual image,” Golden Globes, at ¶ 9, that this is so “even if the word is not used literally,” Remand Order, at ¶ 16, and that its power to offend “derives from its sexual ... meaning,” id. at ¶ 23, the Commission did not mean that every speaker who utters the word invariably intends to communicate an offensive sexual meaning. The Commission explicitly recognized that the word can be used in a manner that does not intend a sexual meaning. A fairer reading of the Commission’s meaning is that, even when the speaker does not intend a sexual meaning, a substantial part of the community, and of the television audience, will understand the word as freighted with an offensive sexual connotation. It is surely not irrational for the Commission to conclude that, according to the understanding of a substantial segment of the community, the F-Word is never completely free of an offensive, sexual connotation. It is no accident that in many languages, the equivalent of the F-Word finds usage, as in English, to express anger, disgust, insult, and confrontation.
What we have is at most a difference of opinion between a court and an agency. Because of the deference courts must give to the reasoning of a duly authorized administrative agency in matters within the agency’s competence, a court’s disagreement with the Commission on this question is of no consequence. The Commission’s *474 position is not irrational; it is not arbitrary and capricious.
I believe that in changing its standard, the Commission furnished a reasoned explanation, and thus satisfied the requirements of the Administrative Procedures Act.[18]1 therefore respectfully dissent.[19]

. Judge Friendly noted:
What gives concern is the manner, alas not atypical of the agencies, in which [a] change was made — slipped into an opinion in such a way that only careful readers would know what had happened, without articulation of reasons, and with prior authorities not overruled, so that the opinion writers remain free to pull them out of the drawer whenever the agency wishes to reach a result supportable by the old rule but not the new.
Henry J. Friendly, The Federal Administrative Agencies 63 (1962).

. Spectators in the courtroom observing the argument of this case would have heard the *472 judges and the lawyers saying “fuck” in open court. Had the case been on another subject, such usage would surely have seemed inappropriate. Because of the issues in this case, the word was central to the issues being discussed. It is not irrational to take context into account to determine whether use of the word is indecent.

. See, e.g., Gail Pennington, Kingpin There Are More Things in Heaven and Earth Than "Sopranos,” NBC Insists, St. Louis Post-Dispatch, Feb. 2, 2003, at FI ("Although they tried at first to feign indifference, broadcasters have seethed for years over the critical acclaim and abundant awards handed to cable series like 'The Sopranos.’ " The complaint: "that the playing field isn’t level. Broadcasters are strained by FCC rules about content — nudity and sex, violence and language — that don't apply to cable.”); Jim Ru-tenberg, New Viewers Object as Unbleeped Bleep Words Spread on Network TV, N.Y. Times, Jan. 25, 2003, at B7 ("Broadcast television, under intensifying attack by saltier cable competitors, is pushing the limits of decorum further by the year, and hardly anyone is *473 pushing back.”); Jim Rutenberg, Hurt by Cable, Networks Spout Expletives, N.Y. Times, Sept. 2, 2001, at 11 ("Broadcast television is under siege by smaller cable competitors that are winning audiences while pushing adult content. In that climate, broadcast is fighting the perception that its tastes are lagging behind those of a media-saturated culture whose mores have grown more permissive.”).

. As each of the instances under review in this case involved the use of the F-Word, and because I find that the Commission has given a rational justification for its rule as applied to use of the F-Word, I do not consider the Commission's standard which makes it a decency violation to use the word "shit.” In Pacifica, in upholding the constitutionality of censorship under § 1464, the Supreme Court stressed the accessibility of broadcasting to children. See Pacifica, 438 U.S. at 749, 98 S.Ct. 3026; Remand Order, at ¶ 51. The potential for harm to children resulting from indecent broadcasting was clearly a major concern justifying the censorship scheme. In this regard, it seems to me there is an enormous difference between censorship of references to sex and censorship of references to excrement. For children, excrement is a main preoccupation of their early years. There is surely no thought that children are harmed by hearing references to excrement.
Nicole Richie’s script called for her to say it was not easy to get "pig crap” out of a Prada purse. In delivering the line, Richie changed "pig crap” to “cow shit.” Had she stuck with "pig crap,” that reference would not have been a violation, but her change to "cow shit” could have resulted in forfeitures and perhaps even the loss of Fox’s license to broadcast. In another instance, the Commission found a violation (which was later vacated on other grounds) because someone was described as a "bullshitter.” See Complaints Regarding Various Television Broadcasts Between February 2, 2002 and March 8, 2005, 21 F.C.C.R. 2664 (2006); Remand Order, at ¶ 73. The justification is surely not that children will be harmed by hearing “shit” but not by hearing "crap.” It appears that at least some of the Commission’s prohibitions are not justified at all by the risk of harm to children but only by concern for good manners. When the censorship is exercised only to protect polite manners and not by reason of risk of harm, I question whether it can survive scrutiny. Because each instance of censorship at stake in this case involved the F-Word, which in the Commission’s view inherently retains a sexual reference, the question does not arise in this case.

. I express neither agreement nor disagreement with my colleagues’ added discussion of Fox's other challenges to the Commission’s actions because, as the majority opinion recognizes, it is dictum and therefore not an authoritative precedent in our Circuit's law. In subsequent adjudications, the respect accorded to dictum depends on its persuasive force and not on the fact that it appears in a court opinion.